UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x                    20 Civ. __5237__

SHANA MELIUS,

                Plaintiff,                    COMPLAINT

    -against-

NEW YORK CITY COUNCIL and                    PLAINTIFF DEMANDS
COUNCIL MEMBER ANDY KING,                    A TRIAL BY JURY
in his individual capacity,

                Defendants.
------------------------------------------------------------x

Plaintiff Shana Melius ("Melius" or "plaintiff"), by her counsel, Law Office of Kevin Mintzer, P.C., complaining of defendants New York City Council ("Council") and Council Member Andy King ("King"), in his individual capacity, (collectively, "defendants") allege as follows:

## NATURE OF CLAIMS

1. Melius, a former employee on the staff of New York City Council Member Andy King, brings this action because King unlawfully retaliated against her for opposing gender discrimination, in violation of the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States ("Equal Protection Clause") through 42 U.S.C. § 1983 ("Section 1983"). The same conduct also constitutes a violation by King and the Council of the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 *et seq.* (the "NYCHRL"). Defendants further violated the NYCHRL by failing to provide Melius with reasonable accommodations so that she could perform her job duties while receiving fertility treatments.

2. Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief under Section 1983 and the NYCHRL.

## PARTIES, JURISDICTION, AND VENUE

3. Plaintiff Shana Melius is a 46-year-old woman. From July 2018 through June 2019, Melius was employed by the New York City Council within the office of Councilmember Andy King. Melius is a citizen of the State of New Jersey.

4. Before working in King's Council office, Melius had approximately 20 years of work experience in public relations, communications, event coordination, and program management. Melius received a Bachelor of Arts from Temple University in 2000, a Master's in Business Administration from Metropolitan College of New York in 2009, and a Master of Arts in Human Services: Health & Wellness from Liberty University in 2012.

5. The New York City Council is the legislative body of the City of New York. The Council maintains its principal offices in New York County within this judicial district. At all relevant times, the Council paid Melius' salary and benefits and maintained personnel policies that governed her employment. The Council was Melius' employer within the meaning of the NYCHRL.

6. Council Member Andy King is a member of the Council elected to represent the Council's 12th district in the Bronx. He has held that office from November 2012 through the present. On information and belief, King resides within this judicial district and he is a citizen of the State of New York. At all relevant times, King acted under color of state law. King was Melius' employer within the meaning of the NYCHRL because, with the authority of the Council, he had the power to hire and fire and take other personnel actions against Melius and other members of King's staff.

7. This Court has federal question jurisdiction over plaintiff's federal claim under 28 U.S.C. § 1331 and 28 U.S.C. § 1343 and supplemental jurisdiction over plaintiff's NYCHRL claims under 28 U.S.C. § 1367. Alternatively, this Court also has diversity jurisdiction over plaintiff's NYCHRL claims under 28 U.S.C. § 1332(a) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8. This Court is an appropriate venue for this action under 28 U.S.C. § 1391(b)(1) because defendants reside in this judicial district.

9. As required by § 8-502(c) of the NYCHRL, plaintiff will serve a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

FACTUAL ALLEGATIONS

<u>The Initial Complaint and Council Investigation into King</u>

10. In or about early December 2017, an employee of the Council filed a complaint that King had engaged in inappropriate and gender-based harassment, in violation of the Council's Anti-Discrimination and Harassment Policy (the "Anti-Discrimination Policy").

11. As a consequence of that initial complaint, from about late 2017 through early 2018, the Office of the General Counsel of the City Council ("OGC") investigated King. This investigation resulted in the City Council's Committee on Ethics and Standards ("Ethics Committee") finding that King had violated the Anti-Discrimination Policy.

12. Shortly after the investigation into the initial complaint became public, King held a staff meeting in the living room of his home, which was attended by Council staff members who worked in his office, as well as by King's wife, Neva Shillingford-King.

13. During this meeting, King and Shillingford-King disclosed the initial complainant's identity, which had not been publicly disclosed. King and Shillingford-King expressed a belief that the Council's investigation into him was "unreasonable" and part of a "larger conspiracy" against King, and they warned King's staff to be loyal.

14. During the same meeting, King and Shillingford-King tried to cast doubt on the initial complainant by noting that she had previously made a sexual harassment complaint against a former member of the New York State Assembly. King and Shillingford-King suggested that the initial complainant had a "track record" of making unfair or unreasonable complaints. In fact, the initial complainant's complaint against the former member of the Assembly had been investigated and substantiated by the New York State Assembly as well as the New York State Joint Commission on Public Ethics, among other entities.

The Council's Second Investigation into King

15. In June 2018, before she was employed by the Council, Melius worked with King in organizing and promoting a community event that King was sponsoring. In early July 2018, King hired Melius to work on his staff on a full-time basis as communications and events manager.

16. By agreement with King, Melius worked primarily out of King's office at 250 Broadway in Manhattan rather than King's district office at 940 East Gun Hill Road in the Bronx. In February 2019, Melius moved to Crown Heights, Brooklyn, and continued to report to 250 Broadway. Melius was required to report to the district office on Monday mornings for a regularly scheduled staff meeting. When that meeting was over, she returned to 250 Broadway.

17. When Melius was required to commute from her home in Crown Heights to King's district office, it took her nearly two hours by public transportation.

18. In or about January 2019, a former member of King's staff, referred to below as Staffer-1, applied for unemployment insurance benefits. In connection with that claim for unemployment benefits, Staffer-1, a woman, alleged that during her employment at the Council, she had been subject to gender-based harassment by King.

19. The New York State Department of Labor found Staffer-1's allegations against King credible and a basis for awarding unemployment benefits for constructive discharge.

20. In or about March 2019, the Council opened an investigation of the allegations of gender-based harassment asserted by Staffer-1 in connection with her claim for unemployment benefits.

21. After the investigation opened, the Council became aware of other allegations of improper conduct related to the management of King's office. These allegations included alleged inappropriate behavior by King's deputy Chief of Staff, Comy Lewis, as well as King's supervision of Lewis. The Council's investigation expanded to include these allegations, among other matters.

22. While the investigation was pending, the Council suspended Lewis with pay pending his completion of anger management training.

23. On or about April 11, 2019, Melius was contacted by Charles Davis, who was, on information and belief, the Chief Compliance Officer of the Council. Davis said he was conducting an investigation for the Council and that he needed to ask Melius some questions. Davis asked Melius to immediately come to his office on the 15th floor of 250 Broadway. Melius complied with that instruction.

24. When Melius arrived at a conference room on the 15th floor, Davis was present with Nicole Benjamin, who was the Council's Chief Diversity Officer. Davis told Melius that he

and Benjamin were investigating King's office. Davis further stated that Melius was required to answer their questions honestly and that if she did not do so, she could be subject to discipline, including termination. Davis also told Melius that the investigation was confidential and that she should not discuss the meeting with anyone else, including King.

25. Melius truthfully answered the investigators' questions.

26. As part of her answers, Melius described an interaction that she had with Lewis in January 2019 in which Lewis, in King's presence, had towered over and screamed at her. Benjamin asked Melius if she felt threatened by Lewis' conduct. Melius replied that she did feel threatened by Lewis, that he was a big man standing over her, and that she could not understand why he would be acting this way toward a woman.

27. Melius further told the investigators that, immediately after this incident, she complained to King privately about Lewis' behavior toward her, which King had witnessed but had failed to address. Melius conveyed to the investigators that she had said to King that a man should not be treating a female co-worker in the way that King had just witnessed, and that King should have stepped in to stop it.

28. In making the above statements to the Council investigators concerning Lewis and King, Melius had a good faith belief that she was opposing discriminatory practices within King's office.

King Learns that Melius Spoke to Investigators

29. On or about April 15, 2019, King held a staff meeting in the living room of his home. Melius attended the meeting.

30. Other than the staff meeting more than a year prior in which King spoke negatively about the initial complainant, it was unusual for staff meetings to be held King's home. There was no logistical reason for the meeting to be held at King's home rather than his offices.

31. At the April 15 meeting, King told his staff that he had received a call from an unnamed person who told him that some of King's staff had spoken with investigators from the Council. King asked the staff members present who had spoken with Council investigators. Initially, none of the staff members responded.

32. King then said that nobody could leave until King learned who had spoken with the investigators and what they had said. It was clear from King's tone and demeanor at this meeting that he was angry and upset.

33. After a long uncomfortable silence, Melius and two other staffers admitted to King that they had spoken to investigators for the Council. When King asked what they had told Council investigators, they replied that those discussions were confidential. Melius, in particular, stated that they did not have to tell King why they were contacted by the Council investigators, but that she had told the investigators the truth. King was dissatisfied with that answer, shaking his head in silence.

34. King's statements and conduct during the April 15 meeting were intended to convey to his staff that they should not have cooperated in the Council's investigation and that, if they already cooperated, they should cease doing so.

35. At the April 15 meeting, King pressured Melius and her colleagues to admit that they had spoken confidentially with Council investigators. By his conduct and statements, King made Melius and other staffers feel intimidated, fearful, and discouraged from cooperating with any Council investigation related to King.

36. On information and belief, as of the April 15 meeting, King was aware that the Council's investigation concerned allegations of gender discrimination or harassment against himself and/or others in his office.

Retaliation and Failure to Accommodate

37. Almost immediately after Melius admitted that she participated in the Council's investigation, she experienced retaliation by King and senior members of his staff.

38. On the day after the April 15 staff meeting, Helen Hines, King's Chief of Staff, told Melius that King had decided that she was no longer permitted to work at King's office in lower Manhattan. Instead, Melius was required to report every day to King's district office in the Bronx. Hines did not offer any explanation for this change.

39. As discussed above, King hired Melius with the explicit understanding that she would work from King's 250 Broadway office. Furthermore, the commute from her new apartment in Brooklyn and King's district office in the Bronx was nearly two hours each way.

40. There was no change in Melius' job duties or any other legitimate reason for this change in Melius' job location. Rather, King was retaliating against Melius.

41. On many occasions, Melius told Hines that the transfer of her work location was retaliation for speaking with the Council's investigators. When Melius made those statements, Hines professed to not know anything about retaliation.

42. In or about late April 2019, King and Melius had a conversation in which King told Melius that she should not have cooperated with the Council's investigation and that Lewis could lose his job because of Melius' statements. In response, Melius asked King whether he would have wanted her to lie. King did not respond.

43. King further retaliated against Melius by interfering with in vitro fertilization (IVF) treatments that Melius had been undergoing since January 2019 because of infertility.

44. Beginning shortly after Melius received the direction to work exclusively at King's district office, Melius repeatedly asked Hines if she could work at least two days per week at 250 Broadway because the doctor she was seeing for IVF was much closer to the 250 Broadway office.

45. Hines refused Melius' legitimate requests to work from the 250 Broadway office, even part-time, even though Melius had performed her duties effectively at 250 Broadway since the beginning of employment. Hines deflected Melius' repeated requests to resume working from 250 Broadway, either by stating only that she would discuss Melius' requests with King or by repeating without further elaboration that King wanted Melius to work from the district office. King only allowed Melius to work at 250 Broadway if Melius was attending a work-related event in lower Manhattan.

46. The long commutes to and from work in the Bronx caused Melius to have physical and mental stress, which interfered with Melius' menstrual cycle. These circumstances were also not conducive to a successful IVF outcome because, among other reasons, Melius was not consistently taking her fertility shots on time and she was not able to attend timely her medical appointments.

47. For example, on April 30, 2019, Melius received instructions from her doctor's office regarding how to mix certain medicines to prepare for a shot that Melius had to administer to herself in advance of an egg retrieval. Melius was required to do this preparation herself because King's office made it so difficult for her to get her doctor's office. Moreover, due to the stress of her work situation, Melius did not mix the medication correctly, which resulted in a failed egg retrieval attempt.

48. On May 3, 2019, Hines sent Melius an email "putting her on notice" about her alleged failure to submit the proper paperwork to be off from work that day. But two days earlier, Melius had notified Hines – both orally and by text – that she had an IVF procedure schedule that day and would need to be off. At the time of the notification, Hines had not said that Melius was required to take any further steps or submit any form to have the day off.

49. On May 9, 2019, Melius met with her fertility doctor, who told Melius that she appeared to be stressed. Melius' doctor also said that to give the IVF treatments a reasonable chance of success, he would need to put restrictions on her work activities.

50. Melius's doctor provided her a written letter, which stated, in relevant part, as follows:

> This is to certify that Ms. Melius is my patient. She has advanced maternal age means time is of the essence, secondary to a stressful work environment. Which has inhibited Ms. Melius from administering her fertility shots on time and in attending her follow up medical visits on time. We failed to retrieve an egg this cycle.
>
> It is my medical recommendation as a Medical doctor that Ms. Melius be assigned a modified work schedule. For example, two days home and three days in the office for the next two months while she is underlying fertility treatment.
>
> Thank you for your patience during this time of medical treatment for my patient. If you have any questions about my medical recommendations, please contact me . . .

51. The day that Melius obtained the letter from her physician, she provided it to Hines to secure the medical accommodation requested by her physician. However, Hines refused to accept the letter and directed Melius to submit the letter to the Council's human resources department, located at 250 Broadway.

52. On May 10, 2019, Melius provided her physician's letter to the Council's human resources office by email.

53. Soon after, King and Hines requested a meeting with Melius, during which King expressed annoyance that Melius had given her doctor's letter to human resources. Melius explained that she had done so at Hines' direction, but that did not satisfy King, who told Melius that it did not matter what human resources said because he was her boss.

54. During this same meeting, King demanded 30 days' advance notice of the dates and times of Melius' medical appointments. Melius explained that the appointments were on Tuesdays and Thursdays for at least the next several weeks, but that the exact timing of the appointments varied depending on the doctor's schedule and other factors. King and Hines did not accept this explanation and were hostile to Melius.

55. On May 14, 2019, Nicole Benjamin, who had received Melius' accommodation request from human resources, informed Melius that she would be permitted to leave the office 2-3 hours early on Tuesdays and Thursdays, with advance notice to King, so that she could attend doctor's appointments. Benjamin stated that she needed additional information to consider the request by Melius' doctor to allow her to work from home for two days per week.

56. Melius did not pursue further discussions with Benjamin on the requested accommodation to work from home because King had told Melius to stop communicating with human resources. King also stated that it did not matter what human resources told her regarding any accommodation and that only he, as her boss, would make decisions about what she could and could not do.

57. On May 14, 2019, Melius sent an email to King and Hines notifying them that she had a doctor's appointment on Thursday, May 16 at 4:30 pm.

58. Hines responded to Melius by email, copying King, in which she stated that King wanted a 30-day calendar for her doctor's appointment and claiming that Melius was "continuously refusing to comply to follow or follow directive." [sic]. Hines added, "your behavior is unacceptable and will no longer be tolerated."

59. There was no basis for Hines' statement that Melius had failed to comply with any directive. On the contrary, Melius had provided a doctor's note, had explained the schedule of her treatments, and had received authorization from the Council to leave early for medical treatments twice a week. Melius responded to Hines' notes by stating, among other things, that she had complied with all requests and that she would not be further harassed about this issue.

60. For the balance of Melius' employment with the Council, King and Hines continued to make it as difficult as possible for her to successfully pursue IVF treatments while continuing to perform her job.

61. Although Benjamin had told Melius that she would be permitted to leave work early twice a week to go to fertility treatments, King did not honor that commitment. King sometimes allowed Melius to leave at 4 pm, but that still did not leave sufficient time for Melius to get to her doctor's office given the commute from the district office.

62. On information and belief, the stress caused by the consistent harassment and retaliation that Melius experienced after she participated in the Council's investigation of King contributed to the failure of Melius' IVF treatments during this period.

63. On or about June 11, 2019, Melius resigned from the Council as a result of the extreme stress caused by the retaliatory treatment detailed above as well as the failure to reasonably accommodate Melius' IVF treatments.

64. On or about October 22, 2019, the Ethics Committee issued a report finding that King engaged in retaliation against members of his staff who participated in the Council's investigations of his office, including Melius. The Council adopted the findings of that report and imposed discipline on King for those offenses, among others.

FIRST CAUSE OF ACTION

Retaliation Under Section 1983

(Against King)

65. Plaintiff repeats and realleges paragraphs 1-64 as if fully set forth herein.

66. By the acts and practices described above, including but not limited to creating a hostile work environment, King, in his individual capacity and under color of state law, retaliated against plaintiff in the terms and conditions of her employment because she opposed gender discrimination in employment and participated in an investigation of discrimination, thus depriving plaintiff of her right under the Equal Protection Clause of the United States Constitution, in violation of Section 1983.

67. As a result of the King's retaliatory actions, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and damages for mental anguish, emotional distress, and humiliation.

68. King engaged in these practices with malice and with reckless indifference to plaintiff's federally protected rights.

SECOND CAUSE OF ACTION

Retaliation Under the NYCHRL

(Against the Council and King)

69. Plaintiff repeats and realleges paragraphs 1-68 as if fully set forth herein.

70. By the acts and practices described above, defendants retaliated against plaintiff in the terms and conditions of her employment because she participated in an investigation of gender discrimination in employment and opposed discriminatory practices, in violation of the NYCHRL § 8-107(7).

71. As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and damages for mental anguish, emotional distress, and humiliation.

72. King engaged in these practices with malice and with reckless indifference to plaintiff's right protected under the NYCHRL.

### THIRD CAUSE OF ACTION

Failure to Accommodate Pregnancy-Related Medical Condition Under the NYCHRL

(Against the Council and King)

73. Plaintiff repeats and realleges paragraphs 1-72 as if fully set forth herein

74. By the acts and practices described above, defendants failed to provide Melius with reasonable accommodations to undergo IVF treatments for infertility, which is a pregnancy-related medical condition with the meaning of NYCHRL § 8-107(22).

75. As a result of defendants' failure to provide plaintiff with reasonable accommodations, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and damages for mental anguish, emotional distress, and humiliation.

76. King engaged in these practices with malice and with reckless indifference to plaintiff's rights protected under the NYCHRL.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter an award:

      (a)    declaring the acts and practices complained of herein in violation of Section 1983 and the NYCHRL;

      (b)    permanently restraining these violations;

      (c)    directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

      (d)    directing defendants to place plaintiff in the position she would be in but for defendants' discriminatory treatment of them, and to make them whole for all earnings they would have received but for defendants' discriminatory and retaliatory treatment;

      (e)    awarding plaintiff compensatory damages for her mental anguish, emotional distress, and humiliation;

      (f)    directing defendant King to pay plaintiff punitive damages;

      (g)    awarding plaintiff pre-judgment and post-judgment interest, as well as reasonable attorney's fees and the costs of this action; and

      (h)    awarding such other and further relief as the Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
      July 8, 2020

                                  LAW OFFICE OF
                                KEVIN MINTZER, P.C.

By:  _____
                                Kevin Mintzer
                                Counsel for Plaintiff
                                1350 Broadway, Suite 2220
                                New York, New York 10018
                                Tel: (646) 843-8180
                                km@mintzerfirm.com