**Privileged & Confidential**
**Attorney Work Product**

NEW YORK CITY COUNCIL
COMMITTEE ON STANDARDS AND ETHICS
-----------------------------------------------------------------X

IN RE THE MATTER OF
COUNCIL MEMBER ANDY KING

-----------------------------------------------------------------X

REPORT OF THE COMMITTEE
ON STANDARDS AND ETHICS

FOR COUNTS ONE, TWO, THREE, AND FOUR OF THE SUPERSEDING CHARGES
DATED OCTOBER 22, 2019

By the Committee on Standards and Ethics
Council Member Steven Matteo, Chair
Council Member Margaret S. Chin
Council Member Vanessa L. Gibson
Council Member Karen Koslowitz
Council Member Stephen T. Levin

**Privileged & Confidential**
**Attorney Work Product**

## TABLE OF CONTENTS

Page

EXECUTIVE SUMMARY ................................................................................................ i

INTRODUCTION ........................................................................................................ 1

RELEVANT PERSONS .................................................................................................. 1

PROCEDURAL BACKGROUND ...................................................................................... 2

NOTICE AND DUE PROCESS .......................................................................................... 4

RELEVANT COUNCIL POLICY, COUNCIL RULES, AND NEW YORK CITY LAW ......... 5

FINDINGS OF FACT AND CONCLUSIONS .................................................................... 6

    I. RETALIATION ...................................................................................................... 6

    II. DISORDERLY CONDUCT ................................................................................... 19

    III. CONFLICTS OF INTEREST ................................................................................ 23

    IV. HARASSMENT ................................................................................................ 30

CONCLUSIONS ........................................................................................................... 32

PROPOSED RECOMMENDED PENALTIES .................................................................... 34

APPENDIX A: RESOLUTION ......................................................................................... 36

## EXECUTIVE SUMMARY

The New York City Council (the "Council"), Committee on Standards and Ethics (the "Committee"), after full and due consideration, based upon the evidentiary record established in the disciplinary proceeding conducted on September 13 and 16, 2019 (the "Hearing"), and presented by Special Counsel to the Council, Carrie H. Cohen, Morrison & Foerster LLP, assisted by Amanda Gayer, Morrison & Foerster LLP, finds that the Superseding Charges against Council Member Andy King ("Council Member King") are substantiated for the reasons set forth in the Findings of Fact and Conclusions below.

The Committee also makes certain recommendations regarding the appropriate penalties to be imposed on Council Member King to address his violations of Council Policy, Council Rules, and the New York City Charter as set forth herein and in the Proposed Resolution attached hereto and incorporated herein as Appendix A. What follows is a summary of the Committee's findings and conclusions.

### CHARGE ONE: RETALIATION

From in or about December 2017 through in or about 2019, Council Member King engaged in a number of actions toward Council staff that constitute retaliation in violation the Council's Anti-Discrimination and Harassment Policy (the "Policy").

#### 2017 Complaint and the First Investigation

In or about early December 2017, a complaint was filed against Council Member King by a complainant ("2017 Complainant") alleging that Council Member King engaged in gender-based harassment in violation of the Policy. After conducting an investigation of the 2017 Complainant's allegations ("the First Investigation"), this Committee found that Council Member King had violated the Policy.

Based on new evidence uncovered during the investigation of the instant disciplinary matter before the Committee, the Committee finds that Council Member King also retaliated against the 2017 Complainant during the course of the First Investigation. Specifically, in or about mid-December 2017, testimony at the Hearing demonstrated that Council Member King called a staff meeting in his home during which he disclosed the name of the 2017 Complainant to his staff and impugned 2017 Complainant's credibility and integrity.

Based upon the evidence presented during the Hearing, the Committee finds that Council Member King engaged in retaliation in violation of the Policy relating to the 2017 Complainant and the First Investigation.

#### Instant Complaint and the Second Investigation

Beginning in or about April 2019 and continuing to date, Council Member King retaliated against multiple staffers who cooperated—or who he feared would cooperate—with the Committee's investigation of the instant complaint that gave rise to the current disciplinary matter

i

("the Second Investigation") in an attempt to undermine, obstruct, and stymie the Second Investigation and discourage his staffers from participating in the Second Investigation.

- Council Member King's Warnings to Staff Not to Cooperate Or Participate in Council Investigations

Specifically, witnesses credibly testified at the Hearing that, on or about April 15, 2019—after the Second Investigation had begun and at another staff meeting held at his home—Council Member King was visibly angry and upset and demanded to know who amongst his staff was cooperating with Council investigators. Based on Council Member King's demeanor and demand, three of his staff members (Staffer-3, Staffer-4, and Staffer-5) felt compelled to admit that they had spoken to Council investigators.[1] Council Member King responded that "people were out to get him" and otherwise further discouraged his staff from participating in the Second Investigation.

The Committee finds that these actions by Council Member King constitute retaliation in violation of the Policy relating to the Second Investigation.

- Council Member King's Specific Retaliation Against Staff

After demanding and receiving admissions that three staffers had spoken to Council investigators, Council Member King engaged in a number of retaliatory measures against his staff, including eventually attempting to terminate certain staffers (Staffer-4 who had admitted to speaking with Council investigators and Staffer-7 who had witnessed, among other things, Council Member King's demand that staff members admit who had spoken with Council investigators) and forcing another staffer (Staffer-5 who admitted to speaking with Council investigators) to resign.[2]

- After the April 15, 2019 staff meeting in his home, and as a further attempt to deter and prevent staff from participating in the Second Investigation, Council Member King began requiring those staff members (Staffer-4 and Staffer-5) who had previously worked from his 250 Broadway office (and both of whom had admitted to speaking with Council investigators) to stop working from that location and instead work only from his district office.

- This change in work location caused specific harm to one particular staff member (Staffer-5) who had a prior mutual understanding with Council Member King to work from the 250 Broadway office because the commute to the district office was approximately two hours each way. Even when this staff member provided Council Member King with a medical reason, substantiated by a doctor's letter, necessitating working from the 250 Broadway office, Council Member King

---

[1] In order to protect identities and prevent further retaliation by Council Member King against current and former staff, and consistent with the Policy, current and former members of Council Member King's staff are referred to by number (*e.g.*, "Staffer-#") and defined in the Relevant Persons section below.

[2] In addition, another staff member who initially had cooperated with the Second Investigation (Staffer-3), later refused to further cooperate including by ignoring a subpoena issued by the Committee to appear as a witness at the Hearing.

continued to retaliate and implemented unreasonable obstacles that prevented this staffer from attending required medical appointments. As a result of this continued retaliation, the staffer was forced to leave the Council's employ.

- In or about July and August 2019, Council Member King attempted to terminate the employment of two staff members (Staffer-4 and Staffer-7) in order to further frustrate and impede the Second Investigation.

  o During the time that the Special Council was seeking to interview witnesses in connection with the Second Investigation, on or about July 23, 2019, Council Member King directed that a staff member (Staffer-4) go home and await a call from him before returning to work. Shortly thereafter on that same day, at Council Member King's direction, this staff member's email access was terminated and the staffer never received a call from Council Member King (or a supervisor). Staffer-4 thus remained at home for five weeks too fearful of losing their job to speak to anyone from Council Member King's office or to reach out to the Council's General Counsel's Office or Human Resources.

  o The same day the Committee voted to open a disciplinary matter regarding the instant allegations against Council Member King, and adopted the charges against Council Member King, on or about August 21, 2019, Council Member King directed that another staffer (Staffer-7) turn in their Council identification and cellular phone and go home and await a call from Council Member King before returning to work. At Council Member King's direction, this staff member's email access immediately was disabled and the staffer never received a call from Council Member King (or a supervisor).

  o Ultimately, on or about September 4, 2019, Council Member King appeared at the Council's Administrative Services Division's offices and submitted Separation Forms for the two staff members he had directed to no longer report to work (Staffer-4 and Staffer-7) and attempted to terminate their employment, falsely claiming that he was terminating them for purposes of "Staff Reorganization."

Based on this credible testimony and a pattern of similar retaliatory behavior toward staff members who admitted participating in the Second Investigation and who had information regarding the Second Investigation, the Committee finds that Council Member King engaged in retaliation in violation of the Policy by engaging in the specific employment actions described above.

## CHARGE TWO: DISORDERLY CONDUCT

From in or about 2016 and continuing until in or about 2019, Council Member King permitted, condoned, and/or failed to prevent a staff supervisor (Staffer-2) from repeatedly

behaving in a verbally and physically threatening manner toward Council Member King and his staff in violation of Council Rules (Council Rule 10.80). Credible testimony at the Hearing demonstrated the following:

- In or about 2016, Council Member King and the supervisor got into an altercation, began shouting and moved toward each other in front of staff, some of whom began to cry.

- In or about July 2016, the supervisor had an altercation with a staff member (Staffer-4) during which the supervisor shouted and attempted to put his hand against the staffer's chest. Despite being informed of this conduct, Council Member King took no steps to address this incident causing that staff member to resign the following month without a job.

- In or about January 2019 during a disagreement between the supervisor and yet another staff member (Staffer-5), the supervisor stood aggressively over that staff member, who was seated, and shouted in a manner that made the staff member fearful of physical contact. Although Council Member King witnessed this incident and the staff member specifically complained to him about it, Council Member King took no steps to address this incident.

- In or about February or March 2019, during an argument with another staff member (Staffer-3), the supervisor threatened that staff member with a physical altercation by demanding that they step out of the building to fight. Despite being informed of this conduct, Council Member King took no steps to address this incident.

Consistent with Council Member King's inaction as described above, in connection with the Second Investigation, Council Member King responded to questions from Council investigators about the aggressive, threatening, intimidating, and/or other disorderly acts of the supervisor towards King staff by claiming only that the supervisor's actions essentially were justified because his staff did not listen to the supervisor and demanding that the supervisor be allowed to continue to report to work.

Based on this credible testimony and pattern of similar behavior by the supervisor and Council Member King's longstanding failure to address it as more fully set forth below and herein, the Committee finds that Council Member King engaged in disorderly conduct by permitting, condoning, and failing to prevent a supervisor in his office (Staffer-2) from repeatedly behaving in a verbally and physically threatening manner toward Council Member King and his staff.

## CHARGE THREE: CONFLICTS OF INTEREST

From in or about 2017 and continuing until in or about 2019, Council Member King knowingly encouraged, permitted, condoned, and/or failed to prevent conduct in his office that

iv

created a substantial number of conflicts of interest, resulting in the misuse of Council resources in violation of the New York City Charter and Council Rules (New York City Charter, Chapter 68 and Council Rule 10.70).

Council Member King allowed the lines between personal and familial interests and his Council duties to become impermissibly and completely blurred in the running of his Council office, which resulted in Council staffers and Council resources being used to personally benefit both Council Member King and his wife. Evidence admitted at the Hearing demonstrated the following multiple conflicts of interest:

- Council Member King permitted his wife, who has a senior position with a labor union (Local 1199) that has business dealings with the Council and the City, to essentially help run his office, participate in employment decisions, including hiring people she liked or recommended some of which were individuals with whom she had worked at Local 1199, and direct staff work in a manner that benefitted her personal reputation and professional status.

- Council Member King permitted his wife to use his email addresses including "CouncilmanAndyKing@gmail.com" to give instructions to his staff concerning Council business, allowed her to attend staff meetings and criticize staff performance, and allowed her to instruct staff on how to better promote Council Member King through their personal social media accounts.

- Through the access to Council staff and resources afforded by Council Member King to his wife, Council Member King enabled his wife's reputation to be advanced in various ways.

    o In or about August of 2017, Council Member King's wife had herself prominently featured in a newsletter that Council Member King's office drafted and sent to newspapers for publication referencing and spotlighting her role in a non-Council annual Legislator/Union "retreat" in the U.S. Virgin Islands.

    o In or about March 2018, Council Member King's wife caused her recognition in an article entitled "30 of New York's Most Remarkable Women," to be posted on Council Member King's social media accounts together with a congratulatory note.

- Using his position, Council Member King permitted his wife to direct the use of Council staff time and resources to perform work for her employer, Local 1199.

    o  In or about July 2017, at Council Member King's wife's direction, a staff member emailed her at her Local 1199 email address an "1199 Support Letter."

    o  In or about October 2017, Council Member King's wife directed a staff member by email to make copies of a Local 1199 contract proposal.

    o  In or about April 2018, Council Member King's wife emailed a staff member a Local1199-related contract document and the staffer responded that they would print the document.

- Council Member King inappropriately utilized Council funds and Council resources to support the "retreat" in the U.S. Virgin Islands that personally benefited himself and his wife. The retreat featured and highlighted Council Member King's wife and her union-employer (Local 1199) and, in 2017, included the wedding of his wife's daughter.

    o  Council Member King underwrote at least one staffer's attendance at the retreat by securing one-time payments, issued through Council payroll, to certain King Staff for the express purpose of having them pay their travel and hotel expenses to the retreat.

    o  Council Member King directed King Staff to prepare fliers and invitations, make and take telephone calls, and prepare summaries and press information relating to the retreat on Council time using Council resources.

- Council Member King demanded the same erasure of boundaries from his staff, requiring them to use their personal vehicles to drive him on a regular basis to and from his Council duties without reimbursement. One Staff member in particular essentially functioned as his driver (Staffer-3) and Council Member King routinely required this staffer to drive him and staff to Council-related events and engagements using the staffer's personal vehicle without reimbursement for gas or maintenance expenses.

Based on this credible testimony and documentary evidence, the Committee finds that Council Member King encouraged, permitted, condoned, and/or failed to prevent conduct in his office that created a substantial number of conflicts of interest, resulting in the misuse of Council resources.

## CHARGE FOUR: HARASSMENT

In or about June 2015, during a staff meeting at which a staffer (Staffer-4) admitted to mistakenly posting a photograph from the New York City Pride March intended for the staffer's

personal twitter account to Council Member King's twitter account, Council Member King stated in front of staff that "I don't approve of this behavior...to me, this is the same as child pornography."

By making such an egregious statement at a staff meeting, the Committee finds that Council Member King engaged in harassment on the basis of sexual orientation and/or gender identity in violation of the Policy.

*[Remainder of page intentionally left blank]*

vii

## INTRODUCTION

Council Member Andy King ("Council Member King") is the duly elected representative from the 12th Council District. The Superseding Charges adopted by the New York City Council (the "Council"), Committee on Standards and Ethics (the "Committee") allege four charges against Council Member King: (1) Retaliation; (2) Disorderly Conduct; (3) Conflicts of Interest; and (4) Harassment (the "Superseding Charges"). These four charges arose out of, and pertain to, conduct by Council Member King that violated Council Policy, Council Rules, and the New York City Charter.

The Committee, being duly empaneled and proceeding in Executive Session, convened for a Hearing concerning the Superseding Charges on September 13 and 16, 2019, (the "Hearing"). The evidence at the Hearing was presented by Special Counsel to the Council, Carrie H. Cohen, Morrison & Foerster LLP ("Special Counsel"), assisted by Amanda Gayer, Morrison & Foerster LLP. Upon due and full consideration of the testimony and documents admitted into evidence at the Hearing, and for the reasons set forth below, the Committee finds that Superseding Charges One through Four against Council Member King have been substantiated and makes recommendations for the appropriate penalties.

## RELEVANT PERSONS

Relevant Council staff members and other individuals are identified as follows:[3]

a.  Council Staff Member-1 ("Staffer-1") was an employee of the Council until in or about December 2018. During Staffer-1's employment at the Council, Staffer-1 worked in the office of Council Member King.

b.  Council Staff Member-2 ("Staffer-2") at all times relevant was and remains an employee of the Council working as a supervisor in the office of Council Member King.

c.  Council Staff Member-3 ("Staffer-3") at all times relevant was and remains an employee of the Council working in the office of Council Member King. The Council issued a subpoena (*see* Council Exhibit ("CX")-54) that commanded Staffer-3 to appear at the Hearing to testify before the Committee, but Staffer-3 failed to appear.

d.  Council Staff Member-4 ("Staffer-4") at all times relevant was an employee of the Council working in the office of Council Member King. Staffer-4 appeared at the Hearing and testified before the Committee on September 13, 2019.

---

[3] In order to protect identities and prevent further retaliation by Council Member King against current and former staff, and consistent with the Policy, current and former members of Council Member King's staff are referred to by number (*e.g.*, "Staffer-#") and defined in the Relevant Persons section below.

e. Council Staff Member-5 ("Staffer-5") was an employee of the Council until in or about June 2019. During Staffer-5's employment at the Council, Staffer-5 worked in the office of Council Member King. Staffer-5 appeared at the Hearing and testified before the Committee on September 16, 2019.

f. Council Staff Member-6 ("Staffer-6") was hired as an employee by the Council in or about May 2019 and works in the office of Council Member King.

g. Council Staff Member-7 ("Staffer-7") at all times relevant was an employee of the Council working in the office of Council Member King and also worked as an intern in the office of Council Member King. Staffer-7 appeared at the Hearing and testified before the Committee on September 13, 2019.

h. Camille Francis ("Ms. Francis") at all times relevant was employed by the Council as the Deputy Director of Administrative Services. Ms. Francis appeared at the Hearing and testified before the Committee on September 13, 2019.

i. Charles Davis ("Mr. Davis") at all times relevant was employed by the Council as the Chief Compliance Officer. Mr. Davis appeared at the Hearing and testified before the Committee on September 13, 2019.

j. Neva Shillingford-King ("Ms. Shillingford-King") at all times relevant was and remains Council Member King's spouse. Ms. Shillingford-King is an employee of the 1199 Service Employees International Union ("1199") and is not employed by the Council (and as the spouse of a Council Member, a waiver from the New York City Conflicts of Interest Board would be required for her to be employed at the Council, which was neither sought nor received). 1199 does business with the City of New York (the "City") and lobbies various agencies and parts of City government.

## PROCEDURAL BACKGROUND

In or about March 2019, the Committee voted to open an investigation regarding allegations against Council Member King and his office. Pursuant to that investigation, the Council's Office of the General Counsel ("OGC") and the Special Counsel interviewed and attempted to interview numerous witnesses from on or about March 18, 2019 through on or about September 9, 2019.[4]

---

[4] In connection with this investigation, the following relevant witnesses, among others, were interviewed by the OGC on the following dates: Staffer-1 on March 18 and April 23, 2019; Staffer-3 on April 9 and May 23, 2019; Staffer-2 and Staffer-4, separately, on April 11 and May 28 and 29, 2019. Council Member King also spoke to the OGC on April 25, 2019. Special Counsel, sometimes in conjunction with the OGC, interviewed the following relevant witnesses on the following dates: Staffer-4 and Staffer-7, separately, on August 29, 2019; Staffer-4 on September 4, 2019; and Staffer-7 on September 9, 2019. (CX-50.) The OGC and the Special Counsel interviewed other individuals and attempted to interview other potential witnesses who either declined or failed to respond to such interview requests.

2

On August 21, 2019, the Committee voted to open a disciplinary matter regarding allegations against Council Member King, and voted to adopt four charges (the "Charges") against Council Member King. These charges pertained to alleged violations of Council Policy, Council Rules, and the New York City Charter, and included: (1) Retaliation; (2) Disorderly Conduct; (3) Conflicts of Interest; and (4) Harassment. The Committee also voted to schedule a Hearing to resolve these Charges on September 10, 2019. The Notice of Charges and Hearing, along with a copy of the Charges and the Procedures for Disciplinary Matters Related to Council Members (the "Disciplinary Procedures") were served on Council Member King through his counsel on August 21, 2019.

Pursuant to paragraph 18 of the Disciplinary Procedures, Council Member King was permitted, but not required, to serve a written Answer to the Charges on the Committee by August 28, 2019. He failed to do so.

On September 5, 2019, the Committee voted to adopt the Superseding Charges against Council Member King, which included the same four charges of Retaliation, Disorderly Conduct, Conflicts of Interest, and Harassment, but with additional facts, most of which related to additional retaliatory conduct by Council Member King that occurred or was discovered after the adoption and service of the initial Charges on August 21, 2019.

On September 6, 2019, in light of the adoption of the Superseding Charges, the Hearing date was adjourned to September 13, 2019. The OGC communicated to Council Member King's counsel that, as a courtesy in light of the Committee's adoption of the Superseding Charges, the deadlines dictated by the Disciplinary Procedures would be extended as follows:

- September 6, 2019: Last day for Council Member King to submit an Answer to the Superseding Charges (if he elected to do so); for the Council to disclose the names of witnesses interviewed and make the Summary of Preliminary Findings available for Council Member King and/or his counsel to review; and for the parties to exchange copies of the exhibits they intended to present at the Hearing.

- September 9, 2019: Last day for the parties to identify witnesses they intended to call at the Hearing.

On September 6, 2019, Council Member King through counsel served an Answer to the Charges on the Committee, and on September 10, 2019, Council Member King through counsel served an Answer to the Superseding Charges on the Committee.

Special Counsel timely served a Disclosure of Witnesses and Disclosure of Exhibits on Council Member King through counsel with updates served on Council Member King's counsel prior to the Hearing. Council Member King did not serve any disclosures of potential witnesses or exhibits.

On September 13 and 16, 2019, with public notice and notice to Council Member King's attorneys, the Hearing was held before the Committee in Executive Session at the Council's office at 250 Broadway.

3

## NOTICE AND DUE PROCESS

Although he had the right to—and was repeatedly advised by OGC of this right—Council Member King did not attend or participate in any aspect of the Hearing. Council Member King's attorneys appeared briefly at the beginning of the Hearing on September 13 before Special Counsel's opening statement and before any evidence was presented to the Committee. Council Member King's attorneys, Welton Wisham, Esq., Law Office of Welton K. Wisham and Lauren P. Raysor, Esq., Law Office of Lauren P. Raysor, addressed the Committee only to state their objections to the Hearing.[5]

Specifically, Council Member King's attorneys claimed that Council Member King had not been given a full and fair opportunity to participate in the Hearing and objected to the denial of their requests for an adjournment of the Hearing, which they claimed violated Council Member King's due process rights.[6] After making their objections, Council Member King's attorneys walked out of the Hearing and did not return for the duration of the Hearing.[7]

As was noted at the Hearing by Council Member Steven Matteo, Chair of the Committee ("Chair Matteo"), contrary to representations made by Council Member King's attorneys, Council Member King was afforded numerous opportunities to participate in the Council's investigation of Council Member King and his office, and the related disciplinary process, and reasonable extensions of the hearing date and other applicable dates had been granted.[8] Specifically, Chair Matteo noted that during the Council's investigation in the spring and summer of 2019, Council Member King refused to cooperate with the Council's investigation and ignored several requests and invitations to meet with Council investigators and the Special Counsel in connection with this matter.[9]

Chair Matteo further noted that, after the Committee voted to open this disciplinary matter on August 21, 2019, Council Member King and his attorneys were offered a number of opportunities to engage with the Committee, the OGC, and the Special Counsel.[10] While Council Member King retained attorneys, he failed to engage with the Council, the OGC, or the Special Counsel in any meaningful and reasonable manner.[11] Despite having been aware of the investigation for months, and having received approximately three weeks' notice of the Hearing date, which ultimately was adjourned from September 10 to September 13, 2019 in an attempt to provide Council Member King's attorneys with additional time to prepare for the Hearing, Council

---

[5] Transcript of Proceedings dated September 13, 2019 ("9/13/19 Tr.") at 10:4-13.

[6] 9/13/19 Tr. at 10:13-18, 11:11-13.

[7] 9/13/19 Tr. at 17:5-8.

[8] Transcript of Proceedings dated September 16, 2019 ("9/16/19 Tr.") at 197:22-198:11.

[9] 9/16/19 Tr. at 199:3-8.

[10] 9/16/19 Tr. at 198:5-199:8.

[11] 9/13/19 Tr. at 14:22-15:9.

4

Member King's attorneys repeatedly requested lengthy adjournments based on ever-changing and non-legitimate reasons.[12]

Council Member King's attorneys also repeatedly were provided with the Disciplinary Procedures, and reminded of the deadlines and requirements therein, but nonetheless failed to follow or avail themselves of those Disciplinary Procedures, deadlines, and requirements, except to file (belatedly) an Answer to the Charges and an Answer to the Superseding Charges, both of which categorically denied the allegations without explanation.

In sum, the procedural history demonstrates that rather than attempt to participate in the disciplinary proceedings, Council Member King's attorneys engaged in a pattern of dilatory and non-responsive behavior designed to delay the Hearing indefinitely and frustrate the Council's disciplinary process as well as a calculated attempt to lay a foundation to make the false allegations of denial of due process that they then made at the commencement of the Hearing.  Further, Council Member King's own retaliatory actions jeopardized the employment status of certain Council staff members and created a situation that required the Committee to grant only a minimal extension of the Hearing timeline.  Accordingly, the Committee finds Council Member King's counsels' objections to the Hearing commencing on September 13, 2019 to be without merit.

## RELEVANT COUNCIL POLICY, COUNCIL RULES, AND NEW YORK CITY LAW

The Council's Anti-Discrimination and Harassment Policy (the "Policy") requires Council Members and Council employees to cooperate with all investigations conducted under the Policy. Cooperation with such investigations is a protected activity under the Policy and the Policy prohibits Council Members from engaging in any form of retaliation against anyone who participates in such protected activity.  Retaliation includes any speech, conduct, or employment action that negatively impacts an individual and is reasonably likely to deter an individual from engaging in protected activity.  Charge One of the Superseding Charges alleges that Council Member King violated this Policy by engaging in retaliation against his staff.

Council Rule 10.80 prohibits disorderly conduct, including willful violation or evasion of any provision of law related to a Council Member's discharge of his or her official duties; commission of fraud upon the City; conversion of public property to a Council Member's own use; knowingly permitting, or allowing by gross culpable conduct, any other person to convert public property; or violating the Council's policies against discrimination and harassment. Conduct that falls within the ambit of this rule includes verbally and physically threatening behavior toward Council staff, and behavior that makes Council staff feel threatened, unsafe, and/or fearful.  Charge Two of the Superseding Charges alleges that Council Member King violated this Rule by knowingly permitting disorderly conduct by a supervisor, Staffer-2.

---

[12] Some examples include, but are not limited to, requesting a six-month adjournment, a 30-day adjournment, and an adjournment for an unspecified amount of time.  Council Member King's attorneys also repeatedly claimed an inability to appear for the Hearing due to various and purported scheduling conflicts, including medical appointments, business conflicts, and international travel.

Chapter 68 of the New York City Charter, and Council Rule 10.70, both prohibit conflicts of interest for Council Members, including prohibiting Council Members from having interests in firms engaged in business dealings with the City; engaging in any business, transaction or private employment, or any financial interest, direct or indirect, which is in conflict with the proper discharge of the Council Member's official duties; using or attempting to use the Council Member's position to obtain any financial gain or other personal advantage; and coercing, by intimidation, threats, or otherwise, any public servant to engage in political activities. Charge Three of the Superseding Charges alleges that Council Member King violated the New York City Charter and Council Rule 10.70 by engaging in conduct that created—or allowed the development of—conflicts of interest within his office.

The Policy also prohibits Council Members and Council staff from using derogatory, abusive, and/or hostile language regarding sexual orientation and/or gender identity. Charge Four of the Superseding Charges alleges that Council Member King violated the Policy by engaging in harassment based on sexual orientation and/or gender identity.

## FINDINGS OF FACT AND CONCLUSIONS

In making findings of fact, the Committee evaluated the evidence presented by the Special Counsel under a "preponderance of the evidence" standard. Preponderance of the evidence means that the Special Counsel had the burden to prove that the conduct related to each charge was more likely than not to have occurred. Stated another way, a preponderance of the evidence means the greater weight of the evidence. It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents. In determining whether a charge was proven by a preponderance of the evidence, the Committee considered the relevant testimony of all witnesses, including their demeanor and credibility, and the relevant exhibits received in evidence. The Committee was permitted to consider hearsay testimony but was instructed by the Chair of its limited evidentiary value.

The Committee found the witnesses who testified at the Hearing to be credible. They testified in a direct and candid manner, were able to recall the relevant incidents in sufficient detail, and gave consistent testimony that often was corroborated by other witnesses and documents admitted into evidence.

## I.   RETALIATION

1.     As fully set forth below, the evidence at the Hearing showed by a preponderance of the evidence that, from late in or about 2017 through in or about 2019, in violation of the Policy, Council Member King repeatedly retaliated against staff that he knew or believed had cooperated—or would cooperate with—Council investigations conducted under the Policy as alleged in Charge One of the Superseding Charges.

## A.   The First Investigation and Council Member King's Warnings to Staff Not To Cooperate

2.     From in or about late 2017 through in or about early 2018, the OGC conducted an investigation of Council Member King (the "First Investigation"). The First Investigation resulted

6

in the Committee finding that Council Member King had violated the Policy, including by engaging in unwelcome conduct towards the complainant (the "2017 Complainant").

3.      Staffer-4 testified at the Hearing that in or about mid-December 2017, within days of the First Investigation being made public, Council Member King held a staff meeting in the living room of his home, which was attended by Council staff members who worked in his office ("King staff" or "staff") as well as Ms. Shillingford-King.[13]   Staffer-4 testified that during this meeting, Council Member King and Ms. Shillingford-King disclosed the name of the 2017 Complainant in the First Investigation, expressed a belief that the First Investigation was "unreasonable" and part of a "larger conspiracy" against Council Member King, and warned King staff to be loyal to Council Member King.[14]

4.      Staffer-4 further testified that during this staff meeting, Council Member King and Ms. Shillingford-King made statements impugning the integrity and credibility of the 2017 Complainant, including by noting that the 2017 Complainant had made a prior similar complaint in connection with an investigation of a different elected official, suggesting that the 2017 Complainant therefore had a "track record" of making unfair or unreasonable complaints, and stating that Council Member King and Ms. Shillingford-King were considering suing the 2017 Complainant for slander.[15]

5.      Staffer-4 explained that after making these remarks about the First Investigation and the 2017 Complainant at the staff meeting, Council Member King and Staffer-2 stated that two King staff members who had regularly staffed Council Member King at events, including Staffer-4 and another King staff member, were not doing enough to protect Council Member King.[16]   Council Member King and Staffer-2 used what Staffer-4 described as "conspiratorial language" to express a belief that Staffer-4 and the other King staff member had relationships with people who worked at the Council's 250 Broadway offices and at City Hall, suggesting that those King staff members had somehow allowed the complaint and/or First Investigation to happen. Staffer-4 testified to feeling nervous at the Hearing even recalling that staff meeting for the Committee.[17]

6.      Staffer-4 further testified that in or about late December 2017, between Christmas and the New Year, Council Member King held an event-planning meeting at his campaign office, which was attended by Council Member King, Ms. Shillingford-King, and King staff.[18]   Staffer-4 testified that Council Member King, Ms. Shillingford-King, and Staffer-2 discussed within earshot

---

[13] 9/13/19 Tr. at 24:12-16, 25:16-17, 26:2-9.

[14] 9/13/19 Tr. at 24:16-19, 24:25-25:7.

[15] 9/13/19 Tr. at 27:3-13.

[16] 9/13/19 Tr. at 27:14-28:2.

[17] 9/13/19 Tr. at 28:2-6, 29:22-30:11.

[18] 9/13/19 Tr. at 31:2-32:6.

7

of other King staff, including Staffer-4, that another Staff member might come forward with additional information about the First Investigation and they glanced in Staffer-4's direction multiple times during that conversation.[19]  Staffer-4 testified that Council Member King's anger and statements at the mid-December staff meeting followed by this end of December discussion, including the glances in Staffer-4's direction, made Staffer-4 feel that Council Member King did not trust Staffer-4, and believed Staffer-4 might provide the Council with additional information related to the First Investigation.[20]  The Committee found this testimony by Staffer-4 credible.

7.     The evidence presented at the Hearing demonstrated that Council Member King's December 2017 statements and conduct at the above-described staff meeting and at his campaign office intimidated King staff into silence.  In or about early January 2018, Staffer-4 was interviewed by Mr. Davis in connection with the First Investigation.[21]  Staffer-4 testified that Staffer-4 did not disclose to Mr. Davis Council Member King's statements and conduct at the above-described December 2017 staff meeting at Council Member King's home.[22]  Staffer-4 testified that while Staffer-4 felt uncomfortable with the above-described statements and conduct by Council Member King at the staff meeting, and particularly with Council Member King's disclosure of the name of the 2017 Complainant, Staffer-4 did not raise those concerns with Mr. Davis because Staffer-4 feared that Staffer-4's employment could be negatively impacted if Staffer-4 did so.[23]

8.     Specifically, Staffer-4 testified about the fear that if Council Member King found out that Staffer-4 told Mr. Davis about Council Member King's statements and conduct at that December 2017 staff meeting, then Staffer-4 would break Council Member King's trust, Council Member King would treat Staffer-4 differently, and Staffer-4 "would not have been able to do [Staffer-4's] job."[24]

9.     In an effort to maintain Council Member King's trust, after speaking with Mr. Davis in connection with the First Investigation, Staffer-4 informed Council Member King that Staffer-4 had been contacted by Mr. Davis and had told Mr. Davis only that Staffer-4 was unhappy that Council Member King's identity had become known to the media in connection with the First Investigation.[25]  Staffer-4 testified that Council Member King "seemed pleased" with that report from Staffer-4.[26]

---

[19] 9/13/19 Tr. at 31:2-32:6.

[20] 9/13/19 Tr. at 32:8-12.

[21] 9/13/19 Tr. at 35:4-9.

[22] 9/13/19 Tr. at 35:10-16; CX-50.

[23] 9/13/19 Tr. at 35:4-8, 36:13-17.

[24] 9/13/19 Tr. at 36:9-37:18.

[25] 9/13/19 Tr. at 37:22-38:17.

[26] 9/13/19 Tr. at 38:18-20.

8

10.     Based on the evidence presented at the Hearing, the Committee concludes that Council Member King's statements regarding the 2017 Complainant at the above-described staff meeting, including Council Member King's disclosure of the 2017 Complainant's identity and his (and failure to contradict his wife's) comments impugning the 2017 Complainant's credibility and integrity, constitute retaliation against the 2017 Complainant in violation of the Policy relating to the 2017 Complainant and the First Investigation.

**B.     The Second Investigation and Council Member King's Warnings to Staff Not to Cooperate**

11.     As testified to by Mr. Davis, in or about January 2019, in connection with a claim for unemployment benefits, Staffer-1 alleged that during Staffer-1's employment at the Council, Staffer-1 had been subject to gender-based harassment by Council Member King.[27]     As demonstrated by the New York State Department of Labor letter (CX-51), Staffer-1's allegations against Council Member King later were found credible and a basis for awarding unemployment benefits for constructive discharge from the Council.[28]

12.     Mr. Davis testified that in or about March 2019, the Council opened an investigation of the allegations of gender-based harassment asserted by Staffer-1 in connection with Staffer-1's claim for unemployment benefits (the "Gender-Based Harassment Investigation").[29]

13.     Mr. Davis testified that during the Gender-Based Harassment Investigation, allegations arose regarding the manner in which Council Member King ran his office, including certain of the allegations detailed in the Superseding Charges and at the Hearing regarding Council Member King's conduct, Council Member King's supervision of and behavior by Staffer-2, and certain conduct by Ms. Shillingford-King.[30]   Accordingly, the Gender-Based Harassment Investigation was expanded to include these allegations (collectively, "the Second Investigation").[31]  During the Second Investigation, the Council suspended Staffer-2 with pay pending Staffer-2's completion of anger management training.[32]

14.     Mr. Davis testified that in connection with the Second Investigation, the OGC asked King Staff to participate in interviews and some of them did so, as indicated on CX-50 (reflecting

---

[27] CX-51; 9/13/19 Tr. at 130:7-19.

[28] CX-51; 9/13/19 Tr. at 130:20-23.

[29] 9/13/19 Tr. at 129:9-10.

[30] CX-53; 9/13/19 Tr. at 130:24-131:8.

[31] CX-53; 9/13/19 Tr. at 130:24-131:8.

[32] 9/13/19 Tr. at 120:18-121:24; CX-13.

ny-1756292

that certain King staff were interviewed by Mr. Davis and/or his staff between March 18 and August 29, 2019).[33]

15.     Mr. Davis testified that in connection with the Second Investigation, the Council sent two letters to Council Member King, which requested that Council Member King participate in the investigation.[34] The OGC also reached out to Council Member King repeatedly by telephone and text message to request that Council Member King speak with Mr. Davis concerning the investigation.[35] Council Member King did not substantively respond to any of these letters, calls, or texts.[36]

16.     Mr. Davis testified that on or about April 25, 2019, Council Member King unexpectedly and without advance notice appeared at Mr. Davis's office.[37] Council Member King stated that he had five minutes to speak about the Second Investigation.[38] Council Member King stated that he would only discuss the Second Investigation as it related to Staffer-2 and declined to discuss any other aspect of the Second Investigation.[39] At the close of the discussion, Mr. Davis provided Council Member King with a copy of the Policy and reminded Council Member King that retaliation against Staff was prohibited under the Policy.[40]

17.     Mr. Davis testified that the OGC ultimately was unable to fully investigate the gender-based harassment allegations made by Staffer-1, in part because Staffer-1 was no longer employed by the Council, and at some point during the investigation Staffer-1 declined to participate further.[41]

18.     Staffer-4, Staffer-5, and Staffer-7 testified that on or about April 15, 2019, roughly one month after the Committee opened the Second Investigation, Council Member King held a staff meeting in the living room of his home.[42] Staffer-5 testified that during this meeting, Council Member King told the Staff that he had received a call from an unnamed caller who told him that some of the King staff had spoken with Council investigators about Council Member King's

---

[33] CX-50.

[34] 9/13/19 Tr. at 132:21-133:5.

[35] 9/13/19 Tr. at 133:6-15.

[36] 9/13/19 Tr. at 133:132:21-133:14.

[37] 9/13/19 Tr. at 132:15-20, 133:18.

[38] 9/13/19 Tr. at 133:18-19.

[39] 9/13/19 Tr. at 133:18-19.

[40] 9/13/19 Tr. at 136:13-22.

[41] 9/13/19 Tr. at 136:23-137:7.

[42] 9/13/19 Tr. at 38:24-25, 39:21-25, 40:18. 93:25-94:11, 96:10-16; 9/16/19 Tr. at 151:9-18.

10

office.[43]   Staffer-4 testified that Council Member King asked the Staff who had spoken with Council investigators.[44]   Staffer-5 testified that initially, none of the King staff responded.[45]

19.   Staffer-4 and Staffer-5 testified that Council Member King told the King staff that nobody could leave until the King staff told Council Member King who had spoken with the investigators and what they had said.[46]   Staffer-4 testified that Council Member King then asked "what's the end game?" "a number of times," and that "he expressed [that] he felt that people were out to get him."[47]   All three witnesses testified that it was clear from Council Member King's tone and demeanor at this meeting that he was "angry," "upset," and "not too happy."[48]

20.   Staffer-4, Staffer-5, and Staffer-7 also testified that after what Staffer-7 described as an uncomfortable silence, which Staffer-5 felt lasted (but the Committee understood did not literally last) about 20 minutes, Staffer-3, Staffer-4, and Staffer-5 admitted to Council Member King that they had spoken to a Council investigator.[49]   Staffer-7 testified that Council Member King asked them what they had told Council investigators, and they replied that those discussions were confidential.[50]   Staffer-5 testified that Staffer-5 stated that they did not have to tell Council Member King why they were contacted by Council investigators, but that Staffer-5 had told the investigators the truth.[51]   Staffer-5 testified that Council Member King showed dissatisfaction with that answer, shaking his head in silence.[52]

21.   Staffer-4 testified that at the time, other than the staff meeting more than a year prior in which Council Member King made comments about the First Investigation and exposed the name of the 2017 Complainant, it was unusual for staff meetings to be held at Council Member King's home, but that subsequent to the opening of the Second Investigation, Council Member King held staff meetings at his home more frequently.[53]   Staffer-4 testified that there was no apparent logistical reason for staff meetings to be held at Council Member King's home rather than in Council Member King's Offices.[54]

---

[43] 9/16/19 Tr. at 151:25-152:8.

[44] 9/13/19 Tr. at 39:14-16.

[45] 9/16/19 Tr. at 152:10-18.

[46] 9/13/19 Tr. at 39:6, 40:24-25, 42:4-7; 9/16/19 Tr. at 152:10-18.

[47] 9/13/19 Tr. at 39:11-14.

[48] 9/13/19 Tr. 39:6, 40:24-25, 42:4-7; 9/16/19 Tr. at 152:22-153:4.

[49] 9/13/19 Tr. at 39:14-20, 95:6-7; 9/16/19 Tr. at 152:9-18.

[50] 9/16/19 Tr. at 153:5-12.

[51] 9/16/19 Tr. at 153:5-12.

[52] 9/16/19 Tr. at 153:3, 153:17, 153:19, 153:25, 154:13.

[53] 9/13/19 Tr. at 33:24-34:6.

[54] 9/13/19 Tr. at 34:7-16.

11

22.     The testimony given by Staffer-4, Staffer-5, and Staffer-7 was consistent in relevant parts and each witness corroborated each other although understandably each witness recalled certain parts of the April 2019 staff meeting slightly differently. Accordingly, the Committee finds their testimony supports a finding that Council Member King's statements and conduct during that April 2019 staff meeting were intended to convey to his staff that they should not have cooperated in the Second Investigation and should not cooperate, or cooperate further, with the Second Investigation or any other Council investigation related to Council Member King.

23.     Based on the credible testimony regarding Council Member King's behavior during the April 2019 staff meeting, including his demeanor and his demand to know which staffers had spoken with Council investigators, the Committee further finds that Council Member King made Staffer-3, Staffer-4, and Staffer-5 feel pressured and compelled to admit that they had spoken confidentially with Council investigators in connection with the Second Investigation.

24.     The Committee finds that Council Member King's behavior during the above-referenced staff meeting, including his demeanor, statements, and demand to know who had spoken to Council investigators, made or may have made King staff feel intimidated, uncomfortable, fearful, and discouraged from cooperating with the Second Investigation or any Council investigation.

25.     The Committee finds that these actions by Council Member King constitute retaliation in violation of the Policy relating to the Second Investigation.

**C.     Council Member King's Specific Retaliation against Staffer-4 and Staffer-5**

26.     Credible testimony at the hearing demonstrated that Council Member King took specific retaliatory actions against staffers including those who had admitted to speaking to Council investigators in connection with the Second Investigation. Staffer-5 and Staffer-7 testified that during or shortly after the April 2019 staff meeting at Council Member King's house described above, Council Member King directed that going forward, Staffer-4 and Staffer-5 (both of whom had admitted to speaking with Council investigators) no longer were permitted to work at Council Member King's office at 250 Broadway, and only Staffer-7 would be permitted to work at Council Member King's office at 250 Broadway presumably because of Staffer-7's legislative work responsibilities.[55]

27.     Staffer-4 testified that following the above-described April 2019 staff meeting, Council Member King, and Staffer-6 at his direction, repeatedly instructed King staff to stay in the North Bronx and work out of the district office, not to go downtown (meaning to Council central offices), and not to go to Council Member King's office at 250 Broadway.[56] At Council Member King's direction, Staffer-6 monitored and enforced the Staff's compliance with these instructions, including by assigning King staff to work in the district office who previously had

---

[55] 9/13/19 Tr. at 92:20-93:13, 98:22-99:17; 9/16/19 Tr. at 154:20-155:22, 156:24-157:7.

[56] 9/13/19 Tr. at 49:12-21.

12

worked primarily or spent equal time at Council Member King's 250 Broadway office, and refusing to allow Staff to go downtown to the Council or the 250 Broadway office.

28.     Staffer-4 testified that Staffer-4's job responsibilities previously had included accompanying Council Member King to meetings and events near 250 Broadway and City Hall, but that after the April 2019 staff meeting referred to above, by in or about July 2019, Council Member King had stopped asking Staffer-4 to accompany him to events or meetings in that area.[57] Staffer-4 credibly testified that Staffer-4 believed that Council Member King stopped asking Staffer-4 to accompany Council Member King to events and meetings downtown in retaliation for Staffer-4's participation in the Second Investigation.[58]

29.     Staffer-4, Staffer-5, and Staffer-7 all credibly testified that they believed the change in work location for Staffer-4 and Staffer-5 was in retaliation for having cooperated with—and spoken to—Council investigators.[59]   Testimony from Staffer-4 and Staffer-5 demonstrated that their work duties and responsibilities did not warrant a change in work location.[60]   Based on this testimony, it is apparent that the disclosure by Staffer-3, Staffer-4, and Staffer-5 that they had participated in the Second Investigation was viewed negatively by Council Member King, and that their disclosure adversely affected and negatively impacted Staffer-4's and Staffer-5's employment with the Council.

30.     Staffer-5 testified that immediately after the April 2019 staff meeting, Council Member King specifically—and additionally—retaliated against Staffer-5 for cooperating with the Second Investigation in an another manner by not permitting Staffer-5 to work in Council Member King's 250 Broadway office, despite Staffer-5's legitimate and established practice of working in the downtown office.    Staffer-5 was hired by Council Member King with the explicit understanding that Staffer-5 would work from Council Member King's 250 Broadway office because of the two-hour commute each way between Staffer-5's residence and Council Member King's district office in the North Bronx.[61]

31.     Staffer-5 credibly testified that Staffer-5 believed that Council Member King's direction that, going forward, Staffer-5 would work only from the district office was in retaliation for Staffer-5's participation in the Second Investigation.[62]   Council Member King never provided a reason as to why Staffer-5 now had to work from the district office, and Staffer-5's work duties did not change in any way.[63]   Additionally, Staffer-5's working relationship with Council Member

---

[57] 9/13/19 Tr. at 49:12-21.

[58] 9/13/19 Tr. at 49:24-25.

[59] 9/13/19 Tr. at 59:19-24, 99:18-100:3.

[60] 9/13/19 Tr. at 49:12-25; 9/16/19 Tr. at 154:22-156:23.

[61] 9/16/19 Tr. at 156:12-19.

[62] 9/16/19 Tr. at 156:12-13.

[63] 9/16/19 Tr. at 156:7-11.

King deteriorated in other ways after Staffer-5 admitted to talking with Council investigators and began to work from the district office.[64]

32.    After receiving the direction to work exclusively at the district office, Staffer-5 testified that Staffer-5 repeatedly asked Staffer-6 if Staffer-5 could work at least two days per week at 250 Broadway, as Staffer-5 was undergoing certain medical treatment that necessitated attending doctor's appointments closer to the 250 Broadway office, as well as avoiding the physical and mental stress of long commutes to work.[65]

33.    Staffer-4's testimony corroborated that Staffer-5 expressed that Staffer-5 was upset about the change of Staffer-5's work location because Staffer-5 had medical issues and a long commute to and from Staffer-5's residence and the district office.[66]

34.    Staffer-5 testified that Staffer-6 refused Staffer-5's legitimate requests to work again from the 250 Broadway office even though Staffer-5 had worked without incident or concern from 250 Broadway prior to admitting at the staff meeting, described above, that Staffer-5 had spoken with Council investigators related to the Council's investigation.[67] According to Staffer-5, Staffer-6 would deflect Staffer-5's repeated requests to resume working from 250 Broadway, either by stating only that that Staffer-6 would discuss Staffer-5's requests with Council Member King, or by simply repeating that Council Member King wanted Staffer-5 to work from the district office without providing any explanation.[68]

35.    Staffer-5 testified that in May 2019 Staffer-5 obtained a written letter from Staffer-5's doctor, admitted as CX-46, which stated that Staffer-5 needed a more accommodating work arrangement for medical reasons, and gave the letter to Staffer-6.[69] According to Staffer-5, Staffer-6 refused to accept the letter and directed Staffer-5 to submit the letter to Human Resources, located at 250 Broadway, which Staffer-5 did on May 10, 2019, per the email chain admitted as CX-34.[70] Staffer-5 testified that Council Member King and Staffer-6 requested a meeting with Staffer-5, during which Council Member King expressed annoyance that Staffer-5 had given the doctor's letter to Human Resources even though Staffer-5 had done so only at Staffer-6's request.[71]

36.    Staffer-5 testified that Council Member King then demanded 30 days' advance notice of the dates and times of Staffer-5's medical appointments, and Staffer-5 explained that the

---

[64] 9/16/19 Tr. at 157:8-16.

[65] 9/16/19 Tr. at 158:18-159:7.

[66] 9/13/19 Tr. at 50:5-18.

[67] 9/16/19 Tr. at 158:15-17, 159:11-19, 156:20-23.

[68] 9/16/19 Tr. at 158:7-17, 159:11-16.

[69] 9/16/19 Tr. at 159:20-160:8; CX-46.

[70] 9/16/19 Tr. at 159:20-160:8; CX-34.

[71] 9/16/19 Tr. at 160:17-161:18, 161:19-25.

14

appointments were two days a week, but the timing was variable.[72]  According to Staffer-5's testimony, Staffer-6 spoke to Staffer-5 in an argumentative and demeaning tone during this meeting.[73]

37.    Following the above-described directives regarding Staffer-5's work location and doctor appointment notification, exhibits demonstrate that Staffer-6 continued to send emails to Staffer-5 regarding Staffer-5's medical appointment schedule, in which Staffer-6 unreasonably demanded 30 days' notice of exact appointment dates and times, criticized Staffer-5's good-faith efforts to comply with these directives, and claimed Staffer-5 had not provided notice of Staffer-5's doctor appointment schedule when Staffer-5 in fact had done so.[74]

38.    The tone and text of these emails show that Council Member King and Staffer-6 were being intentionally obtuse and unreasonable about Staffer-5's request to work from the 250 Broadway office.  For example, on May 3, 2019, Staffer-6 sent Staffer-5 an email with the subject line "NOT IN THE OFFICE," demanding "Where are you?", when Staffer-5 previously had sent Staffer-6 a text message requesting time off to attend a medical appointment.[75]

39.    As another example, on May 14, 2019, in response to an email from Staffer-5 notifying Staffer-6 and Council Member King that Staffer-5 had a medical appointment that week, Staffer-6 wrote that Staffer-5 "continuously refus[ed] to comply or follow directive [*sic*]" to provide a 30-day calendar of Staffer-5's medical appointments, which Staffer-5 had already explained was not possible.[76]

40.    Council Member King was a recipient of these and other similar emails admitted into evidence, which support an inference that Staffer-6's actions were explicitly or implicitly taken at the direction of Council Member King and were condoned and encouraged by Council Member King.[77]

41.    Further, Staffer-5 testified that Council Member King's conduct interfered with her medical issues and on or about June 11, 2019, Staffer-5 resigned from the Council as a result of the stress caused by Council Member King's retaliatory treatment detailed above.[78]

---

[72] 9/16/19 Tr. at 160:17-161:18.

[73] 9/16/19 Tr. at 159:20-162:10.

[74] CX-35, CX-36, CX-37, CX-38, CX-39, CX-40; 9/16/19 Tr. at 162:15-25, 164:4-170:16.

[75] CX-35.

[76] CX-37.

[77] CX-35, CX-36, CX-37, CX-38, CX-39, CX-40.

[78] 9/16/19 Tr. at 163:2-15, 170:22-171:13.

15

**D.   Council Member King's Specific Retaliation Against Staffer-4 and Staffer-7**

42.     On or about July 23, 2019, during the time that the Special Counsel was seeking to interview witnesses in connection with the Second Investigation, Staffer-4 testified that Staffer-2 and Staffer-6 held a meeting with Staffer-4 during which Staffer-2 criticized Staffer-4 on the basis that Staffer-4 had issued a press release that contained an erroneous description of a piece of legislation, and expressed that Council Member King was upset about it.[79]   In reality, the legislation itself contained the error and the press release accurately described the legislation as drafted.[80]   Indeed, that same day at a Council Stated Meeting, Council Member King publicly acknowledged that the legislation itself contained that error.[81]

43.     Staffer-4 testified that within hours of that July 23, 2019 meeting, Staffer-6 called Staffer-4 and instructed Staffer-4 to go home and stop working, and said that Council Member King would call Staffer-4 when he wanted Staffer-4 to return to work.[82]   Staffer-4 testified that shortly thereafter, when Staffer-4 got home that day, Staffer-4 became aware that Staffer-4's Council email access had been cut off and evidence admitted at the Hearing corroborated that Staffer-4's email access was disabled by Council Member King on or around July 23, 2019.[83]   Staffer-4 testified that Staffer-4 never received any further communications or information from Council Member King or a supervisor regarding Staffer-4's employment status or the reason for Staffer-4's apparent suspension.[84]

44.     Staffer-4 credibly testified that Staffer-4 believed that Staffer-4's apparent suspension was in retaliation for Staffer-4's cooperation with the Second Investigation, and that Staffer-4 believed that Council Member King had decided that he "did not trust" Staffer-4.[85]   Staffer-4's testimony regarding Staffer-4's apparent suspension makes clear that Staffer-4's press release accurately describing an error in a piece of legislation was a non-legitimate pretext for removing Staffer-4 from the Staff.

45.     For approximately one month thereafter, Staffer-4 waited to hear from Council Member King or a supervisor, and did not reach out to the Administrative Services Division or OGC for fear that Staffer-4 could be further punished or retaliated against if Staffer-4 disobeyed Staffer-6's direction to go home and await further instruction.[86]   Staffer-4 testified that Staffer-4 received phone calls from Staffer-3 and one other Staff member that Staffer-4 did not return, out

---

[79] 9/13/19 Tr. at 51:11-52:14.

[80] 9/13/19 Tr. at 51:11-52:14.

[81] New York City Council Stated Meeting (July 23, 2019), https://legistar.council.nyc.gov/Calendar.aspx.

[82] 9/13/19 Tr. at 51:4-9, 52:16-23.

[83] 9/13/19 Tr. at 53:1-4; CX-14i.

[84] 9/13/19 Tr. at 54:7-13.

[85] 9/13/19 Tr. at 59:16-24.

[86] 9/13/19 Tr. at 55:5-56:4.

16

of fear that Staffer-4 would anger Council Member King by appearing to disobey Council Member King's directive.[87]  Staffer-4 testified that on one occasion Staffer-4 answered a phone call from Staffer-3 in order to tell Staffer-3 that Staffer-4 was "alive" and "okay."[88]  Staffer-4 testified that Staffer-4 then asked Staffer-3 not to tell other King staff that they had spoken.[89]  Staffer-4 testified that Staffer-4 was "fearful of deviating [from] what [Staffer-4] was told to do" by Council Member King.[90]  The Committee noted that Staffer-4's demeanor during this part of the testimony reflected the fear being described.

46.     On or about August 21, 2019, which is the same day the Committee voted to open a disciplinary matter regarding allegations against Council Member King and adopted the Charges against him, Staffer-7 testified that, at the direction of Council Member King, Staffer-2 called Staffer-7 into a meeting with Staffer-6 in a private office and told Staffer-7 that Staffer-7's employment was not being terminated, but directed Staffer-7 to turn in Staffer-7's Council identification badge and smartphone and no longer report to work.[91]  Staffer-7 testified that Staffer-2 stated that Council Member King "had heard some things regarding [Staffer-7] and he is upset with [Staffer-7]" but no specifics were provided.[92]  Staffer-7 testified that Staffer-6 further informed Staffer-7 that Council Member King would reach out to Staffer-7 regarding the reason for Staffer-7's suspension, but Council Member King did not do so.[93]

47.     Immediately thereafter, Staffer-7 became aware that Staffer-7's Council email had been cut off and evidence admitted at the Hearing corroborated that Staffer-6 at Council Member King's direction requested that Staffer-7's email be disabled on or around August 19, 2019.[94]  Staffer-7 testified that Staffer-7 received no further communications or information from Council Member King or a supervisor regarding Staffer-7's employment status or the reason for Staffer-7's apparent suspension.[95]

48.     The testimony of Staffer-4 and Staffer-7 was corroborated by documentary evidence admitted at the Hearing that showed that in or about August 2019, at Council Member King's direction, Staffer-6 corresponded by email with the Council's Human Resources and Information Technology staff, copying Council Member King and Staffer-2, in order to request suspension of Staffer-4's and Staffer-7's respective Council identification functionality and access

---

[87] 9/13/19 Tr. at 54:19-55:4, 55:15-56:4.

[88] 9/13/19 Tr. at 54:19-55:4.

[89] 9/13/19 Tr. at 54:19-55:4.

[90] 9/13/19 Tr. at 55:18-56:4.

[91] 9/13/19 Tr. at 100:4-102:11.

[92] 9/13/19 Tr. at 100:15-17.

[93] 9/13/19 Tr. at 100:4-102:11.

[94] 9/13/19 Tr. at 102:20-22; CX-14a.

[95] 9/13/19 Tr. at 103:10-11, 104:2-5.

to Council computers, email, and smartphones.[96]  Staffer-4 testified that despite Council Member King prohibiting Staffer-4 from performing any Council-related work during Staffer-4's suspension, Staffer-4 continued to receive a Council paycheck.[97]

49.     Ms. Francis testified that on or about September 4, 2019, Council Member King submitted Separation Forms to the Council in an effort to terminate the employment of Staffer-4 and Staffer-7 and those Forms were admitted into evidence (CX-45a, CX-45b).[98]  Council Member King did not submit additional documentation to Human Resources in accordance with standard Council procedures, as outlined in the Council's Separation Checklist and testified to by Ms. Francis, and claimed falsely on the Separation Forms that Staffer-4 and Staffer-7 were terminated for the purpose of "Staff Reorganization."[99]

50.     Of the three King staff—Staffer-3, Staffer-4, and Staffer-5—who admitted to speaking to Council investigators during the April 2019 staff meeting at Council Member King's home, Staffer-3 is the only one who remains on Council Member King's Staff to date.[100]  Of those three King staff, Staffer-3 also is the only one of the three who stopped cooperating with the Second Investigation, ultimately failing to appear to testify at the Hearing despite having received a subpoena requiring Staffer-3's appearance.

51.     Testimony by Staffer-4, Staffer-5, and Staffer-7, along with the fact that Staffer-3 ceased cooperating with the Second Investigation, ultimately failing to appear at the Hearing in violation of a subpoena, supports an inference that Council Member King engaged in conduct to intimidate and deter King staff from cooperating with the Second Investigation, and conveyed the message that King staff should not meet with Council investigators or otherwise cooperate with the Second Investigation, in violation of the Policy as alleged in Charge One of the Superseding Charges.

52.     Testimony by Staffer-4 and Staffer-5 supports the conclusion that Council Member King sought to terminate Staffer-4 and forced the resignation of Staffer-5 because they had cooperated with the Second Investigation and Council Member King therefore perceived that Staffer-4 and Staffer-5 were likely to further cooperate with the Second Investigation and to be disloyal to Council Member King.  Similarly, testimony by Staffer-7 supports the conclusion that Council Member King sought to terminate Staffer-7 because he perceived that Staffer-7 might be untrustworthy, disloyal, and likely to cooperate with the Second Investigation.

53.     The above testimony and email correspondence and other documents admitted as Council Exhibits at the Hearing supports the conclusion that Council Member King suspended Staffer-4 and Staffer-7 with pay rather than terminating their employment outright because

---

[96] CX-14a, CX-14b, CX-14c, CX-14d, CX-14e, CX-14f, CX-14g, CX-14i.

[97] 9/13/19 Tr. at 56:5-57:15.

[98] 9/13/19 Tr. at 122:17-25, 123:20-124:5; CX-45a; CX-45b.

[99] CX-14l; 9/13/19 Tr. at 122:7-123:6, 123:19-124:13.

[100] CX-50.

18

Council Member King hoped to evade detection of his retaliatory conduct by Council Administrative Services, the OGC, the Special Counsel, and the wider Council.

54.     By engaging in a pattern of retaliatory behavior toward King staff, including repeatedly warning staff members about the consequences of cooperating in Council investigations, singling out staff members who had done so, and engaging in other specific retaliation against multiple members of his staff that he knew, or believed, had cooperated, or would cooperate, with Council investigations authorized by the Committee and conducted under the Policy—which cooperation is a protected activity—Council Member King violated the Policy as alleged in Charge One of the Superseding Charges.

## II.     DISORDERLY CONDUCT

55.     As fully set forth below, the evidence at the Hearing showed by a preponderance of the evidence that, from in or about 2016 and continuing until in or about 2019, Council Member King repeatedly permitted, condoned, and/or failed to prevent Staffer-2 from engaging in disorderly conduct, including behaving in a verbally and physically threatening manner toward Council Member King and his Staff, in violation of Council Rule 10.80 as alleged in Charge Two of the Superseding Charges.

### A.     Staffer-2's Disorderly Conduct Toward Council Member King

56.     In or about 2016, during a staff meeting at Council Member King's district office, Staffer-4 credibly testified that Council Member King and Staffer-2 got into an argument in the office about Staffer-2 doing outside work in addition to Staffer-2's Council job.[101]  Staffer-4 heard Council Member King and Staffer-2 shouting at one another and saw them approach one another, and said that several King staff members who were in the office began to cry.[102]

### B.     Staffer-2's Disorderly Conduct Toward Staffer-4

57.     Staffer-4 further credibly testified that, in or about July 2016, Staffer-4 had a disagreement with Staffer-2 about scheduling at an event that Council Member King and certain Staff attended.[103]  During the disagreement, Staffer-4 testified that Staffer-2 moved closer to Staffer-4 and began to speak loudly to Staffer-4.[104]  Staffer-4 described how Staffer-2 put Staffer-2's hand up towards Staffer-4's chest in an apparent attempt to push Staffer-4.[105]  Staffer-4 backed

---

[101] 9/13/19 Tr. at 45:9-46:19.

[102] 9/13/19 Tr. at 45:19-46:6.

[103] 9/13/19 Tr. at 44:7-21.

[104] 9/13/19 Tr. at 44:7-21.

[105] 9/13/19 Tr. at 44:24-45:5.

19

away from Staffer-2 so that Staffer-2 was not able to push Staffer-4, and walked away.[106]  Staffer-4 informed Council Member King about this incident.[107]

58.    According to Staffer-4, Council Member King took no disciplinary action against Staffer-2 and took no action to otherwise appropriately address this incident.[108]  This testimony was notably consistent with Staffer-4's prior recounting of the incident to Mr. Davis in connection with the Second Investigation, which example Mr. Davis testified he recounted with visual demonstration to Council Member King.[109]

59.    For approximately the next two weeks thereafter, Staffer-4 repeatedly asked Council Member King for a meeting, but Council Member King failed to respond or meet with Staffer-4.[110]  While Staffer-4 eventually was able to relay the incident with Staffer-2 to Council Member King, Council Member King took no action in response.[111]

60.    In or about August 2016, in part because of this incident, Staffer-4 resigned from the Council even though Staffer-4 had not found a new full-time job.[112]  In or about January 2017, Staffer-4 agreed to return to work on Council Member King's Staff at Council Member King's request because Staffer-4 needed a job and it was difficult to secure a new job in government without a recommendation from Council Member King.[113]

## C.    Staffer-2's Disorderly Conduct Toward Staffer-5

61.    Staffer-5 credibly testified that, in or about January 2019, at the district office, Staffer-5 had a disagreement with Staffer-2.[114]  Staffer-5 explained that Staffer-5 was seated, and Staffer-2 stood over Staffer-5 while yelling at Staffer-5.[115]  While Staffer-2 did not make physical contact with Staffer-5, Staffer-5 felt threatened by Staffer-2, who shouted at Staffer-5 in an aggressive tone.[116]  Staffer-5 believed that there was a risk of the interaction becoming violent and unsafe.[117]  This testimony was notably consistent with Staffer-5's prior recounting of the incident

[106] 9/13/19 Tr. at 45:4-5.

[107] 9/13/19 Tr. at 44:13-45:7.

[108] 9/13/19 Tr. at 46:20-47:5.

[109] 9/13/19 Tr. at 136:5-11.

[110] 9/13/19 Tr. at 46:20-47:5.

[111] 9/13/19 Tr. at 46:20-47:5.

[112] 9/13/19 Tr. at 47:12-48:2.

[113] 9/13/19 Tr. at 49:16-50:6.

[114] 9/16/19 Tr. at 174:3-7.

[115] 9/16/19 Tr. at 171:17-172:8.

[116] 9/16/19 Tr. at 171:21-172:4.

[117] 9/16/19 Tr. at 171:21-172:11.

to Mr. Davis in connection with the Second Investigation, which example Mr. Davis testified he recounted with visual demonstration to Council Member King and Council Member King did not refute it.[118]

62.    Staffer-5 explained that Council Member King was present in the room during this interaction.[119] Staffer-5 discussed the incident with Council Member King immediately afterward, telling Council Member King that it was not acceptable for Staffer-2 to speak to Staffer-5 in an aggressive way and act physically threatening toward Staffer-5.[120] Council Member King told Staffer-5 that he would handle the issue.[121] After that incident, according to Staffer-5, Staffer-2 largely stopped speaking to Staffer-5.[122] To Staffer-5's knowledge, Council Member King never discussed the incident with Staffer-2.[123] According to Staffer-5, Council Member King did not take steps to discipline Staffer-2 or otherwise appropriately address this incident.[124]

**D.    Staffer-2's Disorderly Conduct Toward Staffer-3**

63.    Staffer-5 credibly testified that, in or about February or March 2019, Staffer-5 witnessed a disagreement between Staffer-2 and Staffer-3 while preparing for a work-related event at the Williamsbridge YMCA.[125] According to Staffer-5, when Staffer-2 saw Staffer-3 at the event, Staffer-2 beckoned for Staffer-3 to step out into the hallway.[126] In the hallway, Staffer-5 heard Staffer-2 speak so loudly to Staffer-3 that other Staff Members went into the hallway to see what was happening.[127] This testimony was notably consistent with Staffer-3's prior recounting of the incident to Mr. Davis in connection with the Second Investigation—Mr. Davis testified that Staffer-3 told him that Staffer-2 asked Staffer-3 to go outside so they could fight, and that Mr. Davis recounted that incident with visual demonstration to Council Member King.[128] Council Member King did not take steps to discipline Staffer-2 or otherwise appropriately address this incident and did not refute it when Mr. Davis described it both orally and visually to him.[129]

---

[118] 9/13/19 Tr. at 135:10-21.

[119] 9/16/19 Tr. at 172:12-14.

[120] 9/16/19 Tr. at 173:10-14.

[121] 9/16/19 Tr. at 172:24-173:16.

[122] 9/16/19 Tr. at 173:21-174:7.

[123] 9/16/19 Tr. at 173:17-20.

[124] 9/16/19 Tr. at 173:17-20.

[125] 9/16/19 Tr. at 174:8-175:2.

[126] 9/16/19 Tr. at 175:3-5.

[127] 9/13/19 Tr. at 135:23-136:5; 9/16/19 Tr. at 174:20-175:2.

[128] 9/13/19 Tr. at 135:22-136:4.

[129] 9/16/19 Tr. at 175:19-22.

E.     Council Member King's Response to Allegations Regarding Staffer-2

64.     During Mr. Davis's brief conversation with Council Member King on April 25, 2019, Mr. Davis outlined instances of physically threatening behavior by Staffer-2, as alleged by Staffer-3, Staffer-4, and Staffer-5, and even acted out how Staffer-2 had behaved toward them.[130] Consistent with Council Member King's inaction as described above, Council Member King barely acknowledged or responded to the substance of the allegations of threatening behavior by Staffer-2 as explained and demonstrated by Mr. Davis. According to Mr. Davis, Council Member King did not dispute the instances in any way and focused only on supporting Staffer-2 and communicating that he needed Staffer-2 to return to work.

65.     Specifically, Mr. Davis testified that Council Member King asked Mr. Davis how the Council could have suspended Staffer-2 "without [Council Member King's] permission."[131] Mr. Davis further testified that Council Member King told him that the King staff members would not be complaining "if they just did their jobs" and "just listened" to Staffer-2, and that he gave Staffer-2 full authority to run his office.[132] At no time during that discussion or thereafter did Council Member King attempt to refute the allegations.[133]

66.     Based on the above testimony, and testimony from Mr. Davis regarding Council Member King's statements to him during the April 25, 2019 discussion, as well as the consistent manner in which witnesses recounted the incidents to Mr, Davis and at the Hearing, it is evident that Council Member King condoned and defended Staffer-2's disorderly conduct, and repeatedly failed to address reports of Staffer-2's disorderly conduct, which included physically and verbally threatening behavior that caused or was likely to cause King staff members to feel intimidated, fearful, and uncomfortable. The testimony of Staffer-4 and Staffer-5 demonstrated that they each experienced intimidation, stress, discomfort, and emotional distress in the workplace that negatively affected their employment with the Council as a result of Staffer-2's behavior toward them and others.

67.     Based on the foregoing, and the evidence presented at the Hearing, the Committee concludes that Council Member King engaged in a pattern of behavior that fostered—and facilitated—an unhealthy work environment which caused his Staff to feel threatened, unsafe, and fearful, in violation of Council Rule 10.80 as alleged in Charge Two of the Superseding Charges.

III.   CONFLICTS OF INTEREST

68.     As fully set forth below, the testimony and documentary evidence at the Hearing showed by a preponderance of the evidence that, from in or about 2017 and continuing to date, Council Member King knowingly encouraged, permitted, condoned, and/or failed to prevent a number of conflicts of interest resulting in the misuse of Council resources in violation of

---

[130] 9/13/19 Tr. at 133:20-134:9.

[131] 9/13/19 Tr. at 134:19-20.

[132] 9/13/19 Tr. at 134:12-15, 135:8-10.

[133] 9/13/19 Tr. at 134:17-21.

22

Chapter 68 of the New York City Charter and Council Rule 10.70 as alleged in Charge Three of the Superseding Charges.

**A.    Council Member King Permitted Ms. Shillingford-King To Improperly Supervise the Work of King staff**

69.    As the testimony and Council Exhibits demonstrated, Ms. Shillingford-King routinely used email correspondence to supervise, oversee, and direct the work of King staff. In such correspondence, Ms. Shillingford-King issued approvals and directives on behalf of Council Member King. For example:

a.    As demonstrated by CX-24, on or about September 21, 2018, Ms. Shillingford-King used her business email address, NevaS@1199.org, to follow up by email with several King staff about an inquiry from the New York State Comptroller's Office ("Comptroller's Office") regarding constituent concerns about homelessness. Ms. Shillingford-King twice instructed King staff to follow up with the Comptroller's Office to set up the requested meeting.[134]

b.    As demonstrated by CX-27, on or about October 17, 2018, Ms. Shillingford-King used her business email address, NevaS@1199.org, to email a King staff member, requesting that the staff member send her an updated flyer for a seminar being sponsored by Council Member King's office, and instructing the staff member to ask another staff member, who was not a recipient of the email, to send an updated flyer to Ms. Shillingford-King.[135]

c.    As demonstrated by CX-29, on or about November 14, 2018, Ms. Shillingford-King used her business email address, NevaS@1199.org, to email a staff member with instructions to Staffer-2 to "call and confirm" an event RSVP, and asked if a staff member could represent Council Member King at the event.[136]

70.    As the testimony and Council Exhibits demonstrated, Council Member King permitted Ms. Shillingford-King to use his CouncilmanAndyKing@gmail email account to direct his staff. Testimony from Staffer-4 and Staffer-7, which was corroborated by Council Exhibits, showed that Ms. Shillingford-King sent emails to King staff from the email address CouncilmanAndyKing@gmail.com, and read and responded to Council-related emails from that address.[137] Staffer-7 testified that Ms. Shillingford-King also sent emails from the email address

---

[134] CX-24.

[135] CX-27.

[136] CX-29.

[137] 9/13/19 Tr. at 70:18-23, 75:18-76:9, 107:5-22.

23

ElectAndyKing@gmail.com, and read and responded to Council-related emails from that address.[138]

71.     Council Member King permitted Ms. Shillingford-King to direct King staff in additional ways, including the following:

a.      Staffer-7 testified that in or about August 2018, Ms. Shillingford-King improperly supervised King staff during a staff meeting at Council Member King's district office, which was attended by Council Member King, Ms. Shillingford-King, and the King staff.[139] Staffer-7 testified that during that meeting, Staffer-7 witnessed Ms. Shillingford-King single out Staffer-1 and chastise Staffer-1 in front of the rest of the King staff, expressing dissatisfaction with Staffer-1's job performance.[140]

b.      Staffer-4 and Staffer-7 testified consistent with each other that in or about the fall or winter of 2018, Ms. Shillingford-King attended a staff meeting at a restaurant near Council Member King's district office, which was attended by Council Member King, Ms. Shillingford-King, and King staff.[141]  Staffer-4 and Staffer-7 testified that during this meeting, Ms. Shillingford-King told King staff that they were expected to use their personal social media accounts to "like," "share," and "retweet" Council Member King's social media posts.[142]  Staffer-4 and Staffer-7 testified that Ms. Shillingford-King expressed that King staff who failed to do so were not showing enough of a commitment to Council Member King and his team.[143]  Staffer-4 testified that one staffer expressed discomfort with this suggestion and a desire to keep professional and personal social media presences separate, and Ms. Shillingford-King suggested that this staffer was not committed enough to Council Member King and his team.[144]

**B.     Misuse of Council Email and Staff Resources to Publicly Promote the Interests and Reputation of Ms. Shillingford-King**

72.     Testimony and certain exhibits admitted at the Hearing demonstrated that Council staff time and Council email were used by Ms. Shillingford-King to publicize positive information about Ms. Shillingford-King, thereby elevating Ms. Shillingford-King's personal and professional

---

[138] 9/13/19 Tr. at 107:5-22; CX-32.  Staffer-4 testified that Staffer-4 understood that Ms. Shillingford-King used the CouncilmanAndyKing@gmail.com and ElectAndyKing@gmail.com accounts account based upon the tone, phrasing, and content of the emails sent from those accounts. 9/13/19 Tr. at 83:16-23. Staffer-7 testified that Staffer-2 advised Staffer-7 that Ms. Shillingford-King used the CouncilmanAndyKing@gmail.com account.  9/13/19 Tr. at 107:23-108:12.

[139] 9/13/19 Tr. at 105:24-106:7.

[140] 9/13/19 Tr. at 104:18-105:4.

[141] 9/13/19 Tr. at 77:4-9, 105:20-23.

[142] 9/13/19 Tr. at 77:9-21, 105:14-19.

[143] 9/13/19 Tr. at 77:21-25, 105:14-19.

[144] 9/13/19 Tr. at 77:25-78:7.

24

reputation and status through Council Member King's platform as a publicly elected official. For example:

      a.    As demonstrated by CX-32, on or about August 22, 2017, a member of the Staff emailed a draft newsletter titled "Delegation of NY Elected Officials, Labor Leaders Meet with U.S. Virgin Islands Dignitaries" to the email address CouncilmanAndyKing@gmail.com and another member of the staff.[145]  As described above, Staffer-4 and Staffer-7 understood that the email address CouncilmanAndyKing@gmail.com was used by Ms. Shillingford-King.[146]

      b.    As demonstrated by CX-32, later on the same date, the staffer who received the email replied by email and circulated a new version of the newsletter revised to prominently feature Ms. Shillingford-King, who had not been mentioned by name in the previous draft, and identified Ms. Shillingford-King as the "executive vice president of 1199 SEIU."[147]

      c.    As demonstrated by CX-23, on or about March 27, 2018, Ms. Shillingford-King used her business email address, NevaS@1199.org, to email a link to an online article in which she was honored as one of "30 of New York's most remarkable women" to several members of the Staff and Council Member King.[148]  A staffer replied with instructions to post the article on Council Member King's social media account(s) along with a note congratulating Ms. Shillingford-King.[149]  The email correspondence and Staffer-4's testimony support the inference that Ms. Shillingford-King's email was an implicit direction to publicize that article.

      73.    Testimony and certain exhibits admitted at the Hearing demonstrated that Council Member King permitted Ms. Shillingford-King to use email correspondence to misappropriate the time of King staff by directing them during their workday to use Council resources to draft and/or print documents related to the business purposes of her employer, 1199, and for her personal and professional benefit.  At the direction of Ms. Shillingford-King, King staff used Council resources, including, but not limited to, staff time during Council business hours and Council computers, email addresses, printers, paper and ink, to carry out the business of 1199 for the benefit of 1199 and Ms. Shillingford-King in her personal and professional capacity.  For example:

      a.    As demonstrated by CX-33, on or about July 7, 2017, a staffer emailed Ms. Shillingford-King at her business email address, NevaS@1199.org, copying Council Member King and several other members of the King staff, and writing, "Hi Neva, Please see the attached

---

[145] CX-32.

[146] 9/13/19 Tr. at 70:18-23, 75:18-76:19, 107:5-22.

[147] 9/13/19 Tr. at 72:21-73:10; CX-32.

[148] CX-23.

[149] 9/13/19 Tr. at 80:8-20, 83:5-84:15; CX-23.

letter you have requested."  Attached to the email is a document entitled "1199 Support Letter.pdf."[150]

    b. As demonstrated by CX-31, on or about October 24, 2017, Ms. Shillingford-King used her business email address, NevaS@1199.org, to forward an email from an 1199 employee to a member of the Staff.  In the forwarded email, the 1199 employee requested that someone print copies of an attachment, which was an 1199 contract proposal document.[151]

    c. As demonstrated by CX-25 and CX-30, on or about April 19, 2018, Ms. Shillingford-King used her business email address, NevaS@1199.org, to forward an attachment titled "Morris Heights Contract one-pager.docx" to a member of the King staff.  The Staff member responded by email, stating that they were printing the documents, presumably using Council resources in Council Member King's district office.[152]

## C. Council Member King Required Staff to Use Personal Vehicles for Official Council Business without Adequate Reimbursement

74. Staffer-4 and Staffer-7 testified that Council Member King routinely required Staffer-3 to drive Council Member King and King staff to and from Council-related engagements using Staffer-3's personal vehicle.[153]  Staffer-7 testified that Staffer-3's main responsibility was to drive Council Member King.[154]  According to both Staffer-4 and Staffer-7, Council Member King required Staffer-3 to pay for the resulting fuel and/or vehicle maintenance expenses incurred by Staffer-3, and did not reimburse Staffer-3 for those expenses.[155]

75. Staffer-4 saw Council Member King give Staffer-3 a $20 bill at least once toward the end of 2018, ostensibly for Staffer-3's fuel expenses, but as of 2019, Staffer-3 regularly complained to Staffer-4 that Staffer-3 did not have enough money after spending so much on gas and not being reimbursed for those gas expenses by Council Member King.[156]

76. Staffer-7 testified that Council Member King required Staffer-7 to drive Council Member King and King staff to and from Council-related engagements in Staffer-7's personal vehicle.[157]  Each of the approximately five times that Staffer-7 drove Council Member King to work-related events, Staffer-7 paid for the gas and was not reimbursed for those gas expenses by

---

[150] CX-33.

[151] CX-31.

[152] CX-25, CX-30.

[153] 9/13/19 Tr. at 60:5-15, 109:13-15.

[154] 9/13/19 Tr. at 109:9-11.

[155] 9/13/19 Tr. at 60:16-61:3, 61:10-14, 109:16-21.

[156] 9/13/19 Tr. at 60:16-61:3.

[157] 9/13/19 Tr. at 110:3-10, 110:16-21.

Council Member King.[158]   Staffer-7 also testified that Staffer-3, Staffer-2, and two other staffers also had used their personal vehicles to drive Council Member King to work-related events, and that they each paid for the gas without reimbursement from Council Member King.[159]

77.      Staffer-3 failed to appear to testify at the Hearing, despite having received a subpoena requiring Staffer-3 to appear at the Hearing.  Although it did not hear testimony from Staffer-3 directly, the Committee found the testimony given by Staffer-4, Staffer-5, and Staffer-7 regarding Council Member King requiring Staffer-3 to drive Council Member King in Staffer-3's personal vehicle without reimbursement for gas or maintenance to be credible especially because each witness's testimony was corroborated by the other two witnesses' testimony on this subject.

**D.      Council Member King Misused Council Funds and Resources for a Virgin Islands Retreat that Benefitted Himself and Ms. Shillingford-King**

78.      Staffer-4 credibly testified that Council Member King authorized one-time payments to King staff through Council payroll in order for King staff members to attend an Annual Black, Latino, and Asian Legislators & Labor Retreat held in St. Thomas, Virgin Islands (the "St. Thomas Retreat" or "Retreat") that was hosted by Council Member King and Ms. Shillingford-King.[160]  Staffer-4 and Staffer-7 testified that Council Member King authorized these one-time payments so those King staff members who claimed to have insufficient funds to attend the St. Thomas Retreat would have the necessary funds to pay their travel and lodging costs to attend the Retreat.[161]

79.      Staffer-4 and Staffer-7 testified that King staff members who received these one-time payments used them as instructed by Council Member King to pay for their Retreat expenses, including flights, hotels, and meals during the Retreat.[162]  Staffer-4 testified that in 2017, Staffer-4 received a one-time payment of $1,500 in Staffer-4's Council paycheck and used it to pay the expenses to attend the 2017 Retreat.[163]  This testimony supports an inference that Council Member King improperly used Council funds to subsidize non-Council related travel expenses incurred by King staff members who accompanied Ms. Shillingford-King and Council Member King to the Retreat.

80.      Staffer-4 testified that Ms. Shillingford-King's daughter's wedding was part of the official 2017 Retreat itinerary, and an employee of 1199 was prominently featured as the first

---

[158] 9/13/19 Tr. at 110:13-15, 110:22-111:3.

[159] 9/13/19 Tr. at 110:16-111:3.

[160] 9/13/19 Tr. at 65:17-22.

[161] 9/13/19 Tr. at 65:17-22, 113:8-21, 115:12-116:8.

[162] 9/13/19 Tr. at 66:23-67:7, 116:11-15.

[163] 9/13/19 Tr. at 65:17-20.

speaker on the 2017 Retreat itinerary.[164]  CX-43, which is an agenda for the Retreat in 2017, corroborates this testimony.  This testimony and documentary evidence admitted at the Hearing supports a finding that Council Member King and Ms. Shillingford-King used the Retreat to promote Ms. Shillingford-King's personal, reputational, and business-related interests.

81.     Staffer-7 testified that on multiple occasions during Council work hours, at Council Member King's direction, Staffer-7 was required to draft letters and invitations for the Retreat.[165] Staffer-4 similarly testified that King staff were required to draft letters and invitations for the Retreat.[166]  Staffer-4 testified that on multiple occasions during Council work hours, Staffer-4 was directed to draft and print fliers and letters for the Retreat using Council computers and printers, and Staffer-4 was directed either to give the fliers or letters to specific Council Members or Staff Members, or to deliver the Retreat fliers or letters to Council Member King so that Council Member King could pass them out at Council Stated Meetings.[167]

82.     As corroborated by CX-44, Staffer-4 testified that fliers for the Retreat directed invitees to call the King staff member who served as Council Member King's Scheduler at the Scheduler's Council cellphone number.[168]

83.     Staffer-7 testified that during Council work hours, Staffer-7 was directed to make telephone calls related to travel arrangements and accommodations for the 2019 Retreat, and assisted Ms. Shillingford-King in creating an itinerary for the 2019 Retreat.[169]

84.     Staffer-4 testified that every year starting in 2015, following the Retreat, King staff also drafted press summaries of the Retreat that further promoted Ms. Shillingford-King's personal reputation and business interests.[170]  Staffer-4 testified that King staff placed these summaries on Black, Latino, and Asian Legislators & Labor letterhead, selected accompanying photos, and sent the finished summaries to local newspapers and media outlets.[171]

85.     As demonstrated on CX-32 and testified to by Staffer-4, in an early draft press summary on which Staffer-4 worked, there was no mention of Ms. Shillingford-King but that after the draft press summary was sent to Ms. Shillingford-King, the press summary was revised to

---

[164] 9/13/19 Tr. at 69:13-25; CX-43.

[165] 9/13/19 Tr. at 111:10-17.

[166] 9/13/19 Tr. at 112:7-9.

[167] 9/13/19 Tr. at 63:18-64:5.

[168] 9/13/19 Tr. at 67:19-68:9; CX-44.

[169] 9/13/19 Tr. at 112:12-113:5.

[170] 9/13/19 Tr. at 67:19-25, 73:24-74:13; CX-32.

[171] 9/13/19 Tr. at 70:12-71:4, 71:10-17, 72:4-17, 73:14-19.

highlight Ms. Shillingford-King's participation at the Retreat.[172]  Staffer-4 and Staffer-7 testified that their work on Retreat-related press summaries was performed during Council work hours, using Council computers, printers, photocopiers, paper, and ink.[173]

**E.      Council Member King Permitted Ms. Shillingford-King to Exercise Improper Discretion Regarding Employment Decisions Related to King Staff**

86.      Ms. Shillingford-King improperly played a significant role in, and had undue influence over, employment decisions related to King Staff, including hiring and terminating King staff and promoting, demoting, or altering the titles and responsibilities of King staff. For example:

a.      Staffer-4 testified that Staffer-4 met with Ms. Shillingford-King before Staffer-4 was hired and felt that Staffer-4 was offered a job with Council Member King because Ms. Shillingford-King had taken a "liking" to Staffer-4.[174]  Staffer-4 also recalled an exchange with a former supervisor at the Council, who, unhappy with Staffer-4 in that moment, explained to Staffer-4 that Staffer-4 only was working at the Council because Ms. Shillingford-King wanted Staffer-4 there.[175]

b.      Staffer-7 testified that after Council Member King assigned Staffer-7 a different position within his office, Ms. Shillingford-King told Staffer-7 that Ms. Shillingford-King had advised Council Member King to do so.[176]  Staffer-7 also testified that, during Staffer-7's internship with the Council, Staffer-7 expressed concern to Ms. Shillingford-King when Staffer-7 learned that Council Member King was refusing to pay a summer intern that Staffer-7 supervised, despite the fact that the intern was working full-time office hours.[177]  Ms. Shillingford-King became upset with Staffer-7 and then suggested to Staffer-7 that Staffer-7 terminate Staffer-7's internship to "focus on school," which Council Member King agreed to and Staffer-7 subsequently left the internship.[178]

87.      In addition to the above examples, Staffer-4 and Staffer-7 further credibly testified that Ms. Shillingford-King played a role in Council Member King's employment decisions to the extent that several of Council Member King's current and former Staff Members were previously employees of 1199.[179]  Their testimony suggests that Council Member King allowed Ms. Shillingford-King to use his position as a Council Member to the private and personal benefit of

---

[172] 9/13/19 Tr. at 72:21-25-73:10.

[173] 9/13/19 Tr. at 71:19-24, 74:22-75:17, 111:19-112:4.

[174] 9/13/19 Tr. at 78:19-79:1.

[175] 9/13/19 Tr. at 78:19-79:1.

[176] 9/13/19 Tr. at 106:24-107:4.

[177] 9/13/19 Tr. at 90:14-91:11.

[178] 9/13/19 Tr. at 90:14-91:11.

[179] 9/13/19 Tr. at 53:21-25, 78:14-19, 109:22-110:2.

Ms. Shillingford-King's friends and former colleagues at 1199 by securing employment in Council Member King's office for several of Ms. Shillingford-King's friends and colleagues from 1199.

88.     As a result of the acts and conduct described above, Council Member King failed to control and prevent multiple conflicts of interest and misuses of Council resources in violation of the Council's Rules and the New York City Charter as alleged in Charge Three of the Superseding Charges.

## IV.    HARASSMENT

89.     As set forth below, credible testimony at the Hearing showed by a preponderance of the evidence that, in or about 2015, Council Member King engaged in harassment by using derogatory, abusive, and hostile language to express his views regarding sexual orientation and/or gender identity as alleged in Charge Four of the Superseding Charges.

90.     Staffer-4 credibly testified that in or about June 2015, Council Member King held a staff meeting at his district office on the Monday in June following the 2015 New York City Pride March ("Pride March").[180]   Council Member King was visibly upset when he entered the staff meeting, and angrily asked who had posted a photograph from the Pride March on Council Member King's Twitter account.[181]   Staffer-4 testified that Staffer-4 raised Staffer-4's hand and admitted that Staffer-4 had intended to post the photograph on Staffer-4's personal Twitter account, but accidentally had posted the photograph on Council Member King's Twitter account instead.[182]

91.     According to Staffer-4, Council Member King "seemed angry"—in reference to this photograph, which depicted Council Member Corey Johnson and Council Member Rosie Mendez dancing and holding Pride flags, Council Member King stated in sum and substance, "this is unacceptable," and "I don't approve of this behavior [. . .] to me, this is the same as child pornography."[183]   Staffer-4 found it "very upsetting" that Council Member King had essentially equated the behavior depicted in that photo to something as "reprehensible" as child pornography, and those comments by Council Member King continued to make Staffer-4 uncomfortable and negatively impact Staffer-4's work environment from that point forward.[184]   The Committee notes the serious and upset demeanor displayed by Staffer-4 during this testimony.

92.     Staffer-4's testimony supports the conclusion that Council Member King's above-described comments regarding sexual orientation and/or gender identity or expression were vulgar, hostile and unwelcome, and had potential to make King Staff Members uncomfortable, impact

---

[180] 9/13/19 Tr. at 84:6-85:4, 87:6-11.

[181] 9/13/19 Tr. at 85:3-7.

[182] 9/13/19 Tr. at 85:6-7.

[183] 9/13/19 Tr. at 85:7-16.

[184] 9/13/19 Tr. at 85:8-23, 86:4-17.

30

King staff members' employment, and negatively impact King staff in their workplace. In particular, Staffer-4 felt, and continues to feel, uncomfortable in the workplace as a result of Council Member King's harassing and unwelcome comments.[185]

93.　　The Committee finds that by making harassing, unwelcome, and derogatory comments regarding sexual orientation and/or gender identity, Council Member King engaged in harassment in violation of the Policy as alleged in Charge Four of the Superseding Charges.

[*Remainder of page intentionally left blank*]

---

[185] 9/13/19 Tr. at 85:25-86:25.

ny-1756292

## CONCLUSIONS

### VIOLATIONS OF COUNCIL POLICY, COUNCIL RULES, AND NEW YORK CITY LAW

#### SUPERSEDING CHARGE ONE
#### RETALIATION

94.   From in or about December 2017, up to and including in or about 2019, as a result of the evidence presented at the Hearing as set forth above, Council Member King engaged in retaliation against Council staff, including former and current King staff who engaged in, were perceived to have engaged in, or perceived as potentially likely to engage in, a protected activity by cooperating or potentially cooperating with a Council investigation, in violation of the Policy of the Council referenced in this Superseding Charge One below.

(In violation of the Council's Anti-Discrimination and Harassment Policy.)

#### SUPERSEDING CHARGE TWO
#### DISORDERLY CONDUCT

95.   From in or about 2016, up to and including in or about 2019, as a result of the evidence presented at the Hearing as set forth above, Council Member King failed to adequately supervise or discipline a supervisor, failed to adequately address the supervisor's disorderly conduct, and fostered an unhealthy and unduly stressful work environment for his staff.  Council Member King therefore engaged in disorderly conduct in violation of the Council Rule referenced in this Superseding Charge Two below.

(In violation of Council Rule 10.80.)

#### SUPERSEDING CHARGE THREE
#### CONFLICTS OF INTEREST

96.   From in or about 2017, up to and including in or about 2019, as a result of the evidence presented at the Hearing as set forth above, Council Member King permitted, condoned, and failed to prevent multiple conflicts of interest, including misuse of Council resources and funds for private business, personal, and political purposes (including misuse of City time and staff), supervision of King staff by persons not employed by the Council, and requiring an employee to use personal resources for Council purposes.  Council Member King used his position as a public servant and allowed it to be used to obtain private or personal advantages, direct and indirect, for himself and other persons and entities associated with him, in violation of the New York City Law and the Council Rule referenced in this Superseding Charge Three below.

(In violation of Chapter 68 of the New York City Charter
and Council Rule 10.70.)

ny-1756292

## SUPERSEDING CHARGE FOUR
## HARASSMENT

97.     In or about 2015, as a result of the evidence presented at the Hearing as set forth above, Council Member King engaged in harassment of Council Staff Members by comparing a photo from a Pride March to child pornography, and stating that such behavior was unacceptable, thereby using vulgar, derogatory, abusive, and hostile language to express his views regarding sexual orientation and/or gender identity and thereby negatively impacting the employment and work environment of King staff, in violation of the Policy of the Council referenced in this Superseding Charge Four below.

(In violation of the Council's Anti-Discrimination and Harassment Policy.)

## STATEMENT OF COMMITTEE'S REASONS FOR RECOMMENDED SANCTIONS

Pursuant to Council Rule 10.80, the Committee, in addition to the foregoing Findings of Fact and Conclusions, considered the following factors in determining the appropriate recommended sanction(s) to be imposed on Council Member King for his violations of Council Policy, Council Rules, and New York City Law as set forth in the Superseding Charges:

(1) Second Council Policy Violation: In 2017, Council Member King was found to have violated the Policy, and underwent mandated individualized and specialized training in connection with that violation.

(2) Mandated Training Failed to Prevent Further Policy Violations: Council Member King's participation in prior mandated individualized training failed to prevent future violations of the Policy thus necessitating broader sanctions for the violations set forth in Charge One of the Superseding Charges.

(3) Pervasive and Continued Retaliation Against Staff: Council Member King repeatedly engaged in retaliatory conduct toward his staff, including the disclosure of the identity of the 2017 Complainant, and such retaliation continued throughout the instant investigation.

(4) Demonstrated Disregard for Council Policy and Council Rules: Council Member King, through his retaliatory actions toward staff, fostering of disorderly conduct within his office, and certain conflicts of interest, demonstrated a complete disregard and disdain for the orderly and proper functioning of the Council and its policies and rules.

(5) Intimidation of Staff and Creation of Culture of Fear: Council Member King, through his retaliatory actions toward staff, fostering of disorderly conduct within his office, and certain conflicts of interest created an unsafe work environment in which, among other things, Council staff were actively discouraged from, and therefore feared, participating in Council investigations and interacting with Council staff regarding violations of Council Policy and Rules.

33

Based on the above and foregoing Findings of Fact and Conclusions, the recommended sanctions set forth below are appropriate, but not greater than, necessary to punish Council Member King for his egregious conduct, to deter future violations by Council Member King of Council Policy, Council Rules, and the New York City law, to ensure fair and adequate enforcement of Council Policy, Council Rules, and the New York City law, to promote general deterrence, and to ensure Council staff that the Council will appropriately redress violations of Council Policy, Council Rules, and the New York City law.

Therefore, the Committee proposes the recommended sanctions set forth below, which include, but are not limited to, a suspension, monetary fine, and a monitor for the duration of Council Member King's term of office, to ensure that Council staff are appropriately managed in accordance with Council Policy, Council Rules and New York City law.

## RECOMMENDED SANCTIONS

Based upon the Committee's Findings of Fact and Conclusions, the Committee recommends the following Sanctions, which are adopted and set forth in the Committee's proposed Resolution (attached hereto as Exhibit A and incorporated herein as if fully set forth herein):

1. Council Member King shall be suspended, without pay, for a period of 30 days, to commence immediately upon passage and adoption of this Resolution.

2. Council Member King shall be removed from all committee assignments, including any Committee Chairs, effective immediately. Council Member King shall not Chair any committee for the duration of his term, and may reapply for membership on a committee one year after adoption of this Resolution.

3. For the remainder of Council Member King's term in office, Council Member King's Offices shall be subject to a Monitor designated by the Chair of the Committee, with approval by the Council's Office of the General Counsel ("OGC"), in order to ensure that staff in Council Member King's Offices ("King staff") are appropriately managed in accordance with Council Rules and Council Policy.

4. In fulfillment of the foregoing responsibility, which may be amended by the OGC at any time, and in conformity with this Resolution, the Monitor shall be permitted to engage in the following conduct in the manner the Monitor deems most effective:

   a) Review and approve of all hiring, firing, and other employment status decisions for members of King staff;

   b) Have full access to Council Member King and King staff Council email accounts;

   c) Attend King staff meetings, none of which shall be held at Council Member King's residence, and require pre-approval of any off-site staff meetings; and

34

d) Hold regular meetings with King staff, at an interval to be determined by the Monitor, outside the presence of Council Member King.

5. Council Member King shall not allow Staff to use their personal vehicles for Council purposes without adequate reimbursement for same, which reimbursement process shall be approved by the monitor and OGC. This restriction on use of personal vehicles includes driving Council Member King to/from events and/or appearances.

6. Council Member King shall ensure that Neva Shillingford-King is prohibited from giving directions to King staff, attending staff meetings, and using Council resources for any personal or non-Council related business.

7. Any current King staff member who Council Member King has retaliated against may return to work at Council Member King's Offices and have their position and/or responsibilities restored.

8. Council Member King shall complete appropriate training, to be determined by the OGC and at Council Member King's expense, no later than March 1, 2020.

9. Council Member King shall pay a fine of $15,000. While a reasonable payment schedule may be arranged at the OGC's discretion, failure by Council Member King to pay according to said payment schedule may result in the disciplinary proceeding being reopened.

10. Failure by Council Member King to adequately comply with any provision of this Resolution, including full cooperation with the work and directives of the Monitor, may result in reopening of the disciplinary proceeding.

Dated this 22nd day of October, 2019

_____
Council Member Steven Matteo, Chair

_____
Council Member Margaret S. Chin

_____
Council Member Vanessa L. Gibson

_____

35

Council Member Karen Koslowitz

Council Member Stephen T. Levin

## APPENDIX A: RESOLUTION

37

NEW YORK CITY COUNCIL
COMMITTEE ON STANDARDS AND ETHICS
------------------------------------------------------------------X

IN RE THE MATTER OF                              **RESOLUTION**
COUNCIL MEMBER ANDY KING

------------------------------------------------------------------X

Upon due and full consideration of the Report from the Council's Committee on Standards and Ethics (the "Committee"), the Council hereby adopts the resolution of the Superseding Charges brought against Council Member Andy King ("Council Member King") as follows:

**RESOLUTION**

Based upon the Committee's Findings of Fact and Conclusions, the Committee recommends the following Sanctions:

1. Council Member King shall be suspended, without pay, for a period of 30 days, to commence immediately upon passage and adoption of this Resolution.

2. Council Member King shall be removed from all committee assignments, including any Committee Chairs, effective immediately. Council Member King shall not Chair any committee for the duration of his term, and may reapply for membership on a committee one year after adoption of this Resolution.

3. For the remainder of Council Member King's term in office, Council Member King's Offices shall be subject to a Monitor designated by the Chair of the Committee, with approval by the Council's Office of the General Counsel ("OGC"), in order to ensure that staff in Council Member King's Offices ("King staff") are appropriately managed in accordance with Council Rules and Council Policy.

4. In fulfillment of the foregoing responsibility, which may be amended by the OGC at any time, and in conformity with this Resolution, the Monitor shall be permitted to engage in the following conduct in the manner the Monitor deems most effective:

   a) Review and approve of all hiring, firing, and other employment status decisions for members of King staff;

   b) Have full access to Council Member King and King staff Council email accounts;

   c) Attend King staff meetings, none of which shall be held at Council Member King's residence, and require pre-approval of any off-site staff meetings; and

38

    d) Hold regular meetings with King staff, at an interval to be determined by the Monitor, outside the presence of Council Member King.

5. Council Member King shall not allow Staff to use their personal vehicles for Council purposes without adequate reimbursement for same, which reimbursement process shall be approved by the monitor and OGC. This restriction on use of personal vehicles includes driving Council Member King to/from events and/or appearances.

6. Council Member King shall ensure that Neva Shillingford-King is prohibited from giving directions to King staff, attending staff meetings, and using Council resources for any personal or non-Council related business.

7. Any current King staff member who Council Member King has retaliated against may return to work at Council Member King's Offices and have their position and/or responsibilities restored.

8. Council Member King shall complete appropriate training, to be determined by the OGC and at Council Member King's expense, no later than March 1, 2020.

9. Council Member King shall pay a fine of $15,000. While a reasonable payment schedule may be arranged at the OGC's discretion, failure by Council Member King to pay according to said payment schedule may result in the disciplinary proceeding being reopened.

10. Failure by Council Member King to adequately comply with any provision of this Resolution, including full cooperation with the work and directives of the Monitor, may result in reopening of the disciplinary proceeding.

VOTED THIS 22ᵘ DAY OF OCTOBER, 2019
NEW YORK CITY COUNCIL
COMMITTEE ON STANDARDS AND ETHICS


STEVEN MATTEO
CHAIR OF THE COMMITTEE ON STANDARDS AND ETHICS

39