UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHANA MELIUS,

                Plaintiff,

– against –

COUNCIL MEMBER ANDY KING, *in his individual capacity*,

                Defendant.

**OPINION & ORDER**

20-cv-5237 (ER)

R*AMOS*, D.J.:

    Shana Melius, who previously served as a staff member to Andy King, a former member of the New York City Council, brings this action pursuant to 42 U.S.C. § 1983 and various provisions of the New York City Human Rights Law ("NYCHRL"). Complaint ("Compl."), Doc. 1. She asserts retaliation claims pursuant to 42 U.S.C. § 1983 and N.Y.C. Admin. Code § 8-107(7), as well as a claim for failure to accommodate under N.Y.C. Admin. Code § 8-107(22). *Id.* ¶¶ 65–76. Before the Court is King's motion for summary judgment as to all claims. Doc. 60.

    For the reasons set forth below, King's motion is DENIED.

**I.    BACKGROUND**

    **A.  Factual Background**

    Shana Melius began working for the New York City Council ("Council") in July 2018. Resp. to Rule 56.1 Statement ("Rule 56.1 Statement"), Doc. 64 ¶ 1. She was hired as a staff member by Andy King, who served as a Council Member for the 12th Council District in the Bronx. Rule 56.1 Statement ¶¶ 1, 2. King hired Melius on a full-time basis as communications and events manager. *Id.* ¶ 77. As relevant to her claims, Melius

testified that at the time she was hired, King knew that she planned to pursue in-vitro fertilization ("IVF") treatments in hopes of having a child.[1]  *Id.* ¶ 84.

During the time that Melius worked for King, King's staff was spread across various offices:  a Manhattan office located at 250 Broadway, New York, New York; a Bronx "District" office, located at 940 Gun Hill Road, Bronx, New York; and an office at Co-op City, also in the Bronx.  *Id.* ¶¶ 3, 8, 79.  The parties dispute the extent to which Melius primarily worked at the Manhattan office:  Melius contends that, from the outset of her employment with King, her "primary work location" was the Manhattan office, while King contends that she regularly worked out of both the Manhattan office and the Bronx District office.  *Id.* ¶ 20, 79; *see also* Memorandum of Law in Support ("Mem. in Supp."), Doc. 61 at 7.  Specifically, King states that Melius reported to the District office every Monday, at least one other day each week for "late nights," and for staff meetings.  Rule 56.1 Statement ¶ 21.  Melius contends that she reported to the District office "approximately four times per month for staff meetings."[2]  *Id.* ¶ 20.

The parties also disagree about where Melius lived during the period of her employment:  while King contends that she resided in New Jersey, Shoreham, New York, and at two addresses in the Bronx, Melius contends that she lived at various addresses on a temporary basis, and as of February 2019, she lived in Brooklyn.[3]  Rule 56.1 Statement ¶¶ 5, 9.  Melius provided more context regarding her residence during her deposition.  She stated that at the time that she started working in King's office, she and her husband had recently moved to the New York City area from California.  Melius Dep. at 8:19–9:25.  They did not have a permanent home and lived at various temporary locations in

---

[1] In a sworn declaration, Melius stated that she began treatment in January 2019 and told King when the treatment process was starting.  Melius Declaration ("Melius Decl."), Doc. 65 ¶ 17; Rule 56.1 Statement ¶ 86.  Melius was 45 years old at that time.  Rule 56.1 Statement ¶ 28.

[2] During her deposition, Melius testified that she went to the District office "possibly hundreds" of times during her tenure at King's office.  Melius Deposition ("Melius Dep."), Doc. 63-1 at 90:22–23.

[3] Melius concedes that she lived in the Bronx in the fall of 2018, prior to moving to Brooklyn in early 2019.  Rule 56.1 Statement ¶ 18.

2

the area, including at hotels in New Jersey, before moving to Brooklyn in February 2019. *Id.* at 8:11–18; Rule 56.1 Statement ¶ 9.

According to King, Melius lied about being a City resident in order to secure her job, which required her to meet certain residence requirements. *See* Mem. in Supp. at 18–20; Rule 56.1 Statement ¶ 9. King also contends that Melius lied about her criminal history to secure her employment; he emphasizes that Melius represented that she had never been convicted of a misdemeanor or felony, despite the fact that she had prior insurance fraud and drug-related convictions. Mem. in Supp. at 18–20; Rule 56.1 Statement ¶¶ 26–27.

Approximately eight months into Melius' tenure at King's office, in March 2019, the Council opened an investigation into allegations of harassment within the office. Rule 56.1 Statement ¶¶ 32, 38; *see also* Mem. in Supp. at 7; Memorandum of Law in Opposition ("Mem. in Opp'n"), Doc. 67 at 9. The parties dispute the scope and goals of the investigation. While they agree that the investigation began when the Council became aware that another employee, Brea Grate, claimed that King's wife harassed her on the job and forced her to quit, Melius contends that the investigation targeted King and his office, and broadly involved reports of harassment. Rule 56.1 Statement ¶ 38. Melius emphasizes that the Council's Ethics Committee stated that "Grate's complaint was 'gender-based harassment' and that its investigation was proceeding under the Council's 'Anti-Discrimination and Harassment policy.'" *Id.*; *see also* Mem. in Opp'n at 9–10.

On April 11, 2019, a Council compliance officer, Charles Davis, told Melius that he was conducting an investigation and needed to ask her some questions. Rule 56.1 Statement ¶ 32. Melius agreed to meet with Davis. *Id.* ¶ 33. During the meeting, Melius reported an incident from January 2019 wherein another member of King's staff, Comey Lewis, allegedly screamed at Melius while towering over her. *Id.* Melius noted that this, however, was only part of the exchange. *Id.* She added that King was present as Lewis "towered over her, pointed his finger at her, and spoke to her aggressively." *Id.*

3

According to Melius, when she was asked if she felt threatened by this, she replied that she did in fact feel threatened, that Lewis "was a big man standing over her, and that she could not understand why Lewis acted this way toward a woman." *Id.* Additionally, Melius underscored that she reported King's failure to address Lewis' behavior, despite the fact that King had witnessed it and Melius had also brought it to his attention. *Id.* ¶ 96; *see also* King Deposition ("King Dep."), Doc. 66-2 at 123:7–125:14. In addition to reporting the incident with Lewis, Melius discussed an interaction between Lewis and another staff member, Elijah Nawakoka.[4] Rule 56.1 Statement ¶ 34.

The parties dispute, however, the "focus" of Melius' interview with the compliance officer. *Id.* ¶ 36. While King contends that "the focus of the City compliance officer's interview was about Lewis," Melius states that the investigators questioned her about Lewis "*after* the investigators had asked [her] about King." *Id.* In other words, Melius argues that topics discussed during the interview were broader than King contends. *See id.* ¶ 94 ("As part of the interview, Melius was asked about any sexual harassment or other gender discrimination she had witnessed in King's office.").

Lewis was suspended by the City Council in mid-April 2019. *Id.* ¶ 41. On April 15, 2019, King held a staff meeting at his house, during which he told his staff that Lewis had just been suspended. *Id.* ¶ 42. King then asked his staff who had spoken to the Council's compliance officers. *Id.* Melius claims that "[i]nitially, no one responded." *Id.* But King allegedly stated that nobody could leave until he learned who had spoken with the officers. *Id.* He was allegedly angry and upset. *Id.* "After a long uncomfortable silence," Melius and two other staffers admitted to King that they had spoken to investigators. *Id.* When King asked what they had told the investigators, they replied that "those discussions were confidential." *Id.* Melius allegedly stated that she had told the truth, but that she and the other staff members "did not have to tell King why they

---

[4] Both Lewis and Nawakoka are men, and both worked on King's staff during Melius' tenure. Rule 56.1 Statement ¶ 37.

4

were contacted by the Council's investigators[.]" *Id.* King was apparently dissatisfied with Melius' answer and shook his head. *Id.* In his deposition, King stated that he was "sad" when he found out that members of his staff spoke with the officers. King Dep. at 107:6–19. The parties dispute whether King knew that the Council was investigating allegations of gender discrimination in his office. Rule 56.1 Statement ¶ 46.

On April 16, 2019, one day after the meeting at King's house, King's new chief of staff, Helen Hines, told Melius that henceforward she was required to report on a daily basis to the District office in the Bronx, not King's office in lower Manhattan. *Id.* ¶ 48. According to Melius, Hines made it clear that King had decided that she was no longer permitted to work at the Manhattan office. *Id.*

Following this transfer, Melius alleges that she made a mistake mixing her IVF medication, which allegedly resulted in a failed egg retrieval. *Id.* ¶ 51. Melius emphasizes that she "made a mistake in the mixing of her medication as a result of the stress she was under at work and the longer commute." *Id.* ¶ 52.

Thereafter on May 1, 2019, Melius informed Hines that she needed to take the day off on Friday, May 3, 2019, for an IVF procedure. *Id.* ¶ 53. Melius attended the appointment; however, Hines subsequently sent Melius an email instructing her to obtain an official approval for future requests. *Id.* ¶ 55. Less than a week later, on May 9, 2019, Melius attended another appointment. *Id.* ¶ 56. At that appointment, her fertility doctor provided her with a letter that indicated the following:

> To Whom it may concern:
>
> This is to certify that Ms. Melius is my patient. She has advanced maternal age means [sic] time is of the essence, secondary to a stressful work environment. Which has inhibited Ms. Melius from administering her fertility shots on time and in attending her follow up medical visits on time. [sic] We failed to retrieve an egg this cycle.
>
> It is my medical recommendation as a Medical doctor that Ms. Melius be assigned a modified work schedule. For example, two days home and three days in the office for the next two months while she is underlying [sic] fertility treatment.

> Thank you for your patience during this time of medical treatment for my patient. If you have any questions about my medical recommendations, please contact me at 212-481-7888.
>
> Medical information is confidential; if you need more information please contact the patient.
>
> Sincerely,
> Tony Tsai, M.D., F.A.C.O.G.

Tsai Letter, Doc. 65-3 at 2; Rule 56.1 Statement ¶¶ 56–57.

Melius provided the letter to the City Council's Human Resources Office on Friday, May 10, 2019. Rule 56.1 Statement ¶ 58. Several days later, the Council's Chief Diversity Officer, Nicole Benjamin, informed Melius that she was permitted to leave the office two to three hours early on Tuesdays and Thursdays to attend her doctor's appointments, provided that King's office was given advance notice. Id. ¶ 60. Benjamin also stated that, to the extent that Melius wanted to work from home two days a week, additional information would be necessary. Id. ¶ 61.

Melius did not, however, provide Benjamin with more information about the request to work from home. Id. ¶ 62. She claims that she did not do so because King told her to stop communicating with human resources. Id. Melius adds that King became irritated and told her that "it did not matter what human resources said about any accommodation and that only he, as her boss, would make decisions about what she could or could not do." Id. Critically, Melius contends that King and Hines also told her that she would not be allowed to work from home, nor the Manhattan office, on the days in which she had IVF appointments. Id.

On Tuesday, May 14, 2019, Melius notified Hines and King via email that she had an appointment on Thursday, May 16. Id. ¶ 64; Melius Emails, Doc. 65-4 at 3. In response, Hines told Melius that she needed to provide a "30-day calendar" regarding her appointments. Rule 56.1 Statement ¶ 65; Melius Emails at 3. Hines further stated that Melius "continue[d] to give a day at a time notification while continuously refusing to comply or follow [the] directive." Melius Emails at 3. She concluded by stating that

6

Melius' behavior was "unacceptable" and would "no longer be tolerated." *Id.* The parties agree that King subsequently allowed Melius to leave the office at 4 p.m. "on some," but not all, Tuesdays and Thursdays in May 2019. Rule 56.1 Statement ¶ 67.

As relevant to the claims before the Court, the parties agree that Melius did not miss any doctor's appointments between April 15, 2019, and June 11, 2019.[5] *Id.* ¶ 66. However, Melius alleges that she was late to her appointments on at least five occasions during that period. *Id.*

Melius resigned from King's office on June 11, 2019, and took another job working for the office of Congresswoman Yvette Clark the following day. *Id.* In June of 2019, Melius stopped her IVF treatments, in part because her new job did not provide insurance that covered the cost. *Id.* ¶ 69.

Approximately sixteen months later, in October 2020, King was expelled from the City Council. *Id.* ¶ 128; *see also* King Dep. at 181:7. King's termination followed the publication of a Council report, dated September 29, 2020, regarding various substantiated charges against King pursuant to the Council's Committee on Standards and Ethics. *See* Report of the Committee on Standards and Ethics ("Council Report"), Doc. 66-3. Specifically, the Council determined that King engaged in conduct that constituted: (1) violations of the Council's Anti-Discrimination and Harassment Policy, including gender-based harassment and discrimination;[6] (2) violations of conflicts of interest laws; and (3) violations of a Council resolution and disorderly conduct. *Id.* at 5–10.

---

[5] Melius' physician's office was located "near West 28th street, which was less than a 15-minute subway ride from 250 Broadway," King's Manhattan office, but up to one hour and thirty minutes from the District office. Melius Decl. ¶ 18; Rule 56.1 Statement ¶ 63.

[6] The incidents that gave rise to this charge are described in detail in the Council's report. Council Report at 2–67. It is based on conduct that occurred between 2017 and 2018, which concerned the medical needs of "Staffer-1," a female employee on King's staff. *Id.* at 5–7. Melius does not claim that she is "Staffer-1."

### B. Procedural History

Melius filed the complaint in July 2020. She listed both the New York City Council and former Council Member Andy King as defendants. Compl. at 1. King answered on September 18, 2020. Doc. 12. Thereafter on October 30, 2020, the Council answered and asserted a crossclaim against Andy King. Doc. 16. Several months later, the Council was voluntarily dismissed from the action with prejudice on January 26, 2021. Doc. 25; Doc. 26.

The Court held an initial pretrial conference and approved the parties' proposed discovery plan and scheduling order on February 24, 2021. Min. Entry dated Feb. 24, 2021; Doc. 29. The parties thereafter proceeded to discovery.

Nearly a year later, on January 26, 2022, King filed a letter motion requesting a pre-motion conference in anticipation of filing a motion for summary judgment. Doc. 52. The Court held the conference on March 23, 2022, granted King leave to the motion, and provided the parties with a briefing schedule. Min. Entry dated March 23, 2022. The parties briefed the motion pursuant to that schedule, and briefing was completed on May 19, 2022. Doc. 72.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for

trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotation marks omitted).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

In cases based on allegations of discriminatory retaliation, courts use "an extra measure of caution" in considering summary judgment motions "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006).

### III. DISCUSSION

#### A. Retaliation Claims[7]

Melius brings retaliation claims pursuant to the Equal Protection Clause of the United States Constitution as well as the NYCHRL, N.Y.C. Admin. Code § 8-107(7).

---

[7] In the complaint, Melius brought retaliation claims under federal and local law.  *See* Compl. ¶¶ 65–72.  In her federal retaliation claim, Melius asserts:

> By the acts and practices described above, including but not limited to creating *a hostile work environment*, King, in his individual capacity and under the color of state law, retaliated against plaintiff in the terms and conditions of her employment because she opposed gender discrimination . . . depriving plaintiff of her right Under the Equal Protection Clause of the United States Constitution, in violation of Section 1983.

Compl. ¶¶ 65–72. She specifically alleges that King retaliated against her due to her participation in an investigation of gender discrimination and her opposition to discriminatory practices in the workplace. *See id.* ¶¶ 66, 70.

To establish a prima facie case of retaliation in the employment context, a plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir. 2001). An "adverse employment action" is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

The Second Circuit has made clear that courts must analyze NYCHRL claims separately and independently from any federal and state claims because conduct that is not actionable under federal and state law may nevertheless be actionable under the "broader New York City standards." *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108 (2d Cir. 2013)).

   i. **Federal Claim**

"Section 1983 provides a private cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Boyland v. Wing*, 487 F. Supp. 2d 161, 167 (E.D.N.Y. 2007) (quoting 42 U.S.C. § 1983).

---

*Id.* ¶ 66 (emphasis added). However, as King notes, Melius did not set out a hostile work environment claim as a separate cause of action in her complaint. *See generally* Compl.; *see also* Reply Memorandum of Law in Support ("Reply Mem."), Doc. 71 at 11–12. It was not until Melius filed her opposition to King's summary judgment motion that she raised this theory as a separate and independent claim for relief. *See* Mem. in Opp'n at 19–21. Because an opposition to a summary judgment motion is not the place for a plaintiff to raise new claims, the Court will not consider the hostile work environment claim at this stage of the proceedings. *See, e.g.*, *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach the merits of argument raised for first time in opposition to summary judgment and indicating that plaintiffs who fail to include a claim in their complaint can move to amend the complaint); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); Fed. R. Civ. P. 8(a).

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). To succeed in her retaliation claim under Section 1983, Melius must allege that: (1) the challenged action deprived her of a right secured by the Constitution or federal law, and (2) defendants are state actors or acted under color of state law at the time of the challenged action. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999); *see also Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 136–37 (2d Cir. 1999).

The Second Circuit has recognized that Section 1983 is an appropriate vehicle for retaliation claims pursuant to the Equal Protection Clause, and specifically that such a retaliation claim may be based upon adverse actions following an employee's participation in discrimination investigations.[8] *See, e.g.*, *Hicks v. Baines*, 593 F.3d 159, 171 (2d Cir. 2010) ("The premise of this lawsuit is that plaintiffs were treated differently—that is, they suffered retaliation—on the basis of their participation in discrimination investigations and proceedings. That participation obviously constitutes an 'impermissible' reason to treat an employee differently."); *see also Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 81 (2d Cir. 2015) ("We conclude that a claim of retaliation for a complaint that alleged discrimination is actionable under § 1983 . . . .").

King contends that no reasonable jury could find that Melius experienced an adverse employment action, nor does "Melius assert that she made or pursued a claim of

---

[8] King argues that "Melius'[] claim under the Equal Protection clause should be dismissed as a matter of law because it is in substance a class-of-one claim, which does not apply in the public employment context . . . ." Mem. in Supp. at 5; *id.* at 13–16; *see also Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 598, 607 (2008) (holding that the "class-of-one theory," which provides employees with a cause of action where they are treated differently from others for "a bad reason, or for no reason at all," does not apply in the public employment context."). That argument relies on the following conclusions: Melius' claim (1) does not assert that she was targeted based on membership in a protected social group; (2) Melius does not assert that she was treated differently than others similarly situated; (3) the investigation carried out by the Council did not question Melius about invidious discrimination protected by the Equal Protection clause. *Id.* at 5–6. However, several of those conclusions are in dispute here. For example, a stated above, the record contains evidence that Melius reported gender-based harassment. *See* Rule 56.1 Statement ¶ 38. Accordingly, at this juncture, the Court cannot conclude that Melius' claim is barred on this basis.

11

discrimination against King or anyone else." Mem. in Supp. at 10, 15. According to King, because "nothing in the record shows that Melius spoke out against King or otherwise participated in protected activity arising from or derived from any claim of invidious discrimination protected by the Equal Protection clause," summary judgment must be entered as to this claim. *Id.* at 15. In response, Melius argues that she did indeed experience an adverse employment action after she engaged in protected activity. Mem. in Opp'n at 17, 22. She cites her transfer from King's lower Manhattan office to the District office in the Bronx as the adverse employment action, and she emphasizes that the transfer occurred immediately after she admitted to having participated in the Council's harassment investigation. *Id.* at 17, 22.

Taking account of all the evidence in the record, the Court denies King's motion as to Melius' federal retaliation claim. Contrary to King's contentions, a reasonable jury could indeed find that Melius suffered an adverse employment action—a permanent transfer to King's District office in the Bronx, which significantly increased her daily commute to work and to her IVF appointments—after she engaged in a protected activity—here, providing information about gender-based harassment to the Council's compliance officer.

First, the Court concludes that genuine issues remain as to whether Melius suffered an adverse employment action. As stated above, an "adverse employment action" is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 57. That King characterizes Melius' transfer as a "petty inconvenience[] over work schedules or longer commutes" is not dispositive here. Mem. in Supp. at 10. Indeed, as King himself notes, "a longer commute can, in some circumstances," raise a question of fact for a jury on a retaliation claim like the one before the Court. *Id.* at 12 (citing *Shargani v. N.Y.C. Dep't of Envt'l Prot.*, No. 21 Civ. 337 (AKH), 2022 WL 1046764, at *1, 3 (S.D.N.Y. Apr. 7, 2022); *Terry v. Ashcroft*, 336 F.3d 128, 145 (2d Cir. 2003) (noting that a reasonable trier of fact could

conclude that an employment action resulting in a "much more taxing commute than would otherwise have been possible" could support a retaliation claim) (additional citation omitted). As Melius points out, courts in this Circuit have regularly held that a relocation like hers can raise a genuine dispute for consideration by a jury. Mem. in Opp'n at 17; *see, e.g.*, *Collazo v. Cnty. of Suffolk, N.Y.*, No. 12 Civ. 2196 (JS), 2013 WL 12370714, at *2, 7 (E.D.N.Y. Mar. 19, 2013) (holding that "Plaintiff's relocation to an undesirable office" could constitute an adverse employment action).

Here, Melius contends that the office transfer resulted in a significantly lengthier commute to work: specifically, she emphasizes that the commute from her Brooklyn residence to King's office "increased from about one hour per day to almost four hours per day."[9] Mem. in Opp'n at 17; *see also* Rule 56.1 Statement ¶ 105. This occurred during a time when King and his staff knew that Melius was undergoing fertility treatments. Rule 56.1 Statement ¶ 84. Importantly, the transfer also lengthened Melius' commute between her place of work and her IVF appointments, which were located in Manhattan. *Id.* ¶ 63. Indeed, King agrees that after the transfer, it could take Melius up to an hour and a half to get to the doctor's office from King's District office in the Bronx, *id.* ¶ 63, whereas, when she was based out of King's Manhattan office, Melius could attend fertility treatments during her lunch break, *id.* ¶ 105. *See* note 5.

There are also genuine, material factual disputes as to whether Melius' conversations with the Council's compliance officer amounted to protected activity. King argues that "nothing in the record shows that Melius spoke out against King or otherwise participated in protected activity arising from or derived from any claims of invidious

---

[9] The parties dispute the extent to which "reporting to work at the District Office was already a part of Melius'[] duties." Compare Mem. in Supp. at 5 *with* Mem. in Opp'n at 9 ("Before King began to retaliate against Melius, she reported to King's main district office at 940 Gun Hill Road in the Bronx once per week for a morning staff meeting. At the end of the staff meeting, Melius returned to her regular work location at 250 Broadway. Melius also occasionally went to the Bronx for a "late night" with King's staff.") (internal citations omitted). Based on the record, a reasonable jury could find in Melius' favor, specifically insofar as the office transfer increased her regular, or average, commute to work in the way that she claims.

discrimination protected by the Equal Protection clause. The evidence only shows that human resources agents were investigating conduct alleged to be rude or belligerent conduct on the job, not race or gender discrimination." Mem. in Supp. at 15. However, that contention is belied by the record before the Court. In a sworn declaration, Melius stated that she reported instances of gender discrimination on behalf of Lewis; specifically, she noted various ways in which Lewis treated women in King's office in an aggressive and threatening manner.[10] Melius Decl. ¶¶ 24–26. Additionally, Melius reported that King did nothing to rectify this alleged harassment, even though he personally witnessed it and Melius brought it to his attention. *Id.* ¶ 25; *see also* King Dep. 123:7–125:14. Contrary to King's contentions, Melius' claims do not seek relief for a violation of "a workplace code of general civility" or merely "rude or offensive conduct." Mem. in Supp. at 14. Drawing all inferences in Melius' favor, the facts support a conclusion that Melius reported invidious gender-based discrimination protected by the Equal Protection clause. *Liberty Lobby, Inc.*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.") (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

      To be sure, it is possible that a jury would choose to credit King's version of events over Melius' recollections. But the question before the Court is not one regarding credibility determinations or the weight of the evidence; rather, the Court is tasked with determining whether a reasonable jury could possibly find in Melius' favor as to her federal retaliation claim based on the evidence produced throughout discovery. *See Liberty Lobby, Inc.*, 477 U.S. at 255. Because the Court finds that a reasonable jury could return a verdict in favor of Melius, it denies King's motion for summary judgment as to Count I of the complaint.

---

[10] That Melius also reported instances of Lewis' hostile behaviors toward men does not mean that Melius was not reporting gender-based discrimination when speaking with Council compliance officers.

### ii. NYCHRL Claim

NYCHRL prohibits employers from "retaliat[ing] or discriminat[ing] in any manner against any person because such person has . . . opposed any practice forbidden" under the law.  Restoration Act § 3 (amending N.Y.C. Admin. Code § 8-107(7)).  "To prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action."  *Mihalik*, 715 F.3d at 112 (citations omitted).

Here, for the same reasons outlined above in regard to Melius' federal retaliation claim, genuine issues of material fact remain as to the NYCHRL claim.  Indeed, the NYCHRL retaliation inquiry "is broader than its federal counterpart," *Barry v. Macy's, Inc.*, No. 20 Civ. 10692 (CM), 2022 WL 1104847, at *9 (S.D.N.Y. Apr. 13, 2022), and the federal standard serves as "a floor" below which applications of the NYCHRL cannot fall, *Velazco*, 778 F.3d at 410 (citation omitted).  Accordingly, because a reasonable jury could find in Melius' favor under both standards, King's motion is similarly denied as to Count II of the complaint.

### B. Failure to Accommodate Claim

Count Three of the complaint brings a claim for a violation of N.Y.C. Admin. Code § 8-107(22), which provides the following:

> It shall be an unlawful discriminatory practice for an employer to refuse to provide a reasonable accommodation, as defined in section 8-102, to the needs of an employee for the employee's pregnancy, childbirth, or related medical condition that will allow the employee to perform the essential requisites of the job, provided that such employee's pregnancy, childbirth, or related medical condition is known or should have been known by the employer.  In any case pursuant to this subdivision where the need for reasonable accommodation is placed in issue, it shall be an affirmative defense that the person aggrieved by the alleged discriminatory practice could not, with reasonable accommodation, satisfy the essential requisites of the job.

N.Y.C. Admin. Code § 8-107(22)(a).  The term "reasonable accommodation" is defined as "such accommodation that can be made that does not cause undue hardship in the

15

conduct of the covered entity's business. The covered entity has the burden of proving undue hardship." N.Y.C. Admin. Code § 8-102(1).[11]

Melius alleges that "[b]y the acts and practices described above, defendants failed to provide [her] with reasonable accommodations to undergo IVF treatment for infertility, which is a pregnancy-related medical condition within the meaning of NYCHRL § 8-107(22)." Compl. ¶ 74. She further notes that as a result of King's failure to accommodate her, she suffered, and will continue to suffer, irreparable injury, monetary damages, and damages for mental anguish, emotional distress, and humiliation. *Id.* ¶ 75. Indeed, Melius attributes her resignation and her unsuccessful IVF treatments, at least in part, to King's actions. *Id.* ¶¶ 62, 63.

According to King, "Melius' claim for failure to provide a reasonable accommodation fails for two simple reasons." Mem. in Supp. at 6. First, King argues that "it is undisputed that Melius was provided with an accommodation to leave work early to go to her doctor's appointment" and Melius did not miss any of her appointments during the period at issue. *Id.* Second, King contends that "Melius did not suffer from any kind of disabling condition related to child birthing or pregnancy and as such did not have a condition protected under the NYCHRL." *Id.*

Melius disputes both contentions. Mem. in Opp'n at 24–30. She emphasizes that King refused to allow her to work from Manhattan two times a week in order to attend

---

[11] The NYCHRL provides factors which may be considered in this inquiry, which include:

(a) The nature and cost of the accommodation;

(b) The overall financial resources of the facility or the facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(c) The overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees, the number, type, and location of its facilities; and

(d) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

N.Y.C. Admin. Code §§ 8-102(a)–(d).

her doctor's appointments, *id.* at 27, further denied her request to work from home two days a week, and instructed her to stop communicating with human resources about her accommodation requests, *id.* at 28. She also argues that fertility treatments are covered under the statute, regardless of the basis for the need of that treatment. *Id.* at 26. Finally, Melius points out that King failed to plead or show that the requested accommodations would have amounted to an undue hardship to his office. *Id.* at 30.

The Court finds that the record raises genuine disputes of material fact as to Melius' failure-to-accommodate claim. A reasonable jury could find both (1) that Melius qualified for the requested accommodations due to her infertility condition and (2) King failed to provide that accommodation despite the fact that doing so would not have amounted to an undue hardship. *See* N.Y.C. Admin. Code § 8-102(1). As Melius points out, nothing in the applicable statute or the City's guidance regarding discrimination on the basis of pregnancy distinguishes the need to provide accommodation for some types of infertility and not others. *See* Mem. in Opp'n at 25–26 (citing N.Y.C. Human Rights Commission, Legal Enforcement Guidance on Discrimination on the Basis of Pregnancy, *available at* https://www.nyc.gov/assets/cchr/downloads/pdf/publications/Pregnancy_InterpretiveGuide_2021.pdf).

Critically, the fact that King is not "aware" of cases that extend this section of the NYCHRL to the circumstances of this case is not dispositive. Mem. in Supp. at 17–18. Indeed, as King notes, the city's guidance "refers to infertility as a medical condition." *Id.* at 17. Nor does King's supposition that relief in favor of Melius would require accommodating any woman who is beyond typical years of childbirth, for the purpose of undergoing *in vitro* procedures, dictate the outcome here. *Id.* at 18. Indeed, the applicable sections of the administrative code suggest that the City may very well have intended to extend discrimination and accommodation protections to precisely those individuals. *See* N.Y.C. Admin. Code §§ 8-107(22)(a), 8-102(1).

17

A reasonable jury could thus find that Melius was not properly or sufficiently accommodated under the applicable provisions. King contends that because Melius never fully missed any of her doctor's appointments, she cannot now claim that King failed to accommodate her under the statute. Mem. in Supp. at 6. However, as King also acknowledges, Melius was late to at least five appointments due to her office transfer.[12] *Id.* And King allegedly directed Melius to stop communicating with human resources about her accommodation requests as she sought to coordinate an appropriate plan. Rule 56.1 Statement ¶¶ 62, 120. These facts certainly raise genuine questions regarding whether King made an accommodation available to Melius, whether that accommodation was appropriate in light of her medical needs, and whether Melius requested an accommodation that would have placed an undue hardship on the operations of King's office. That Melius may have succeeded in her efforts to obtain the medical care she needed *despite* King's alleged actions or inactions does not bar her failure-to-accommodate claim as a matter of law.

For these reasons, King's motion for summary judgment is also denied as to Count III of the complaint.

### C. Equitable Estoppel Arguments

Finally, in his motion for summary judgment, King argues that "Melius should be equitably estopped from asserting the protections derived from her employment status because she made materially false and perjurious statements in her employment application about her residence and her criminal history." Mem. in Supp. at 6. Because the New York City Administrative Code sets out that an employee who provides false information to meet the residence requirements to secure City employment, King contends, Melius should not be able to seek "the benefits of a status that she secured by

---

[12] Melius argues that, as a result, her appointments were "rushed, and she did not have time to get the instruction from the nurses that she needed." Mem. in Opp'n at 28 (citing Rule 56.1 Statement ¶ 123).

fraudulent means." *Id.* (citing *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232–33 (1959)).

King's argument requires various logical leaps: first, it assumes that Melius did, in fact, make false statements about her residence and criminal history in her employment application; second, it assumes that Melius must have secured her employment via fraudulent means; and third, it assumes that those conclusions would strip her of the employment protections provided by the United States Constitution and the NYCHRL as a matter of law.

At the same time, King's argument relies primarily on a 1956 Supreme Court case that does not address the circumstances now before the Court. *See id.* at 6, 19 (citing *Glus*, 359 U.S. at 232–35). That case concerned possible equitable relief for a plaintiff's failure to timely file an action due to the defendant's misrepresentations about the applicable statute of limitations. *Glus*, 359 U.S. at 232–35 (concluding that a case was erroneously dismissed pursuant to the applicable statute of limitations where the petitioner could show that he was misled by the respondent as to the length of the limitations period). *Glus* does not, however, consider the availability of equitable estoppel as a viable defense to various retaliation and discrimination claims at the summary judgment stage. And even if *Glus* applied to the circumstances now before the Court, estoppel is an affirmative defense that "must affirmatively" be stated by a defendant in response to a pleading stating a claim for relief. Fed. R. Civ. P. 8(c)(1); *see* Mem. in Opp'n at 30.

Here, the Court can neither assume the facts required by King's equitable estoppel argument nor conclude that it is meritorious as a matter of law. The record simply provides insufficient evidence to support the legal conclusions that King asks the Court to make. *Compare* Mem. in Supp. at 18–19 (asserting that Melius lied about being a resident of New York City and lied under oath about her criminal history) *with* Mem. in Opp'n at 30–31 (arguing that Melius did not lie about her residence because she did not

19

have a permanent address at the time she was hired, and emphasizing that Melius seeks legal, not equitable, relief); *see also* Melius Dep. at 8:11–9:25.  Accordingly, the Court rejects King's contention that Melius should be barred from seeking the requested damages at this stage of the proceedings.[13]

## IV.     CONCLUSION

For the foregoing reasons, King's motion for summary judgment is DENIED.

The parties are directed to appear for a telephonic status conference at 10 a.m. on February 16, 2023.  The parties are directed to dial (877) 411-9748 and enter access code 3029857#.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 60.

It is SO ORDERED.

Dated:   February 3, 2023
         New York, New York

                                                                _____
                                                                  EDGARDO RAMOS, U.S.D.J.

---

[13] In his opening brief, King stated that "Melius argues that equitable estoppel does not apply and that the after-acquired evidence doctrine is the only proper rule of law to govern her misconduct."  Mem. in Supp. at 19.  The after-acquired evidence doctrine allows a defendant employer, in some instances, to request that courts limit damages where new evidence shows that an employee's misconduct would have inevitably led to termination.  *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 356 (1995).  At this juncture, the parties agree that the doctrine does not apply to the instant case.  Doc. 61 at 19; Mem. in Opp'n at 31.  Accordingly, the Court will not analyze it here.